BLACK LAKE PIPE LINE
COMPANY, Petitioners,

v.

UNION CONSTRUCTION COMPANY,
INC., et al., Respondents.

No. B–5285.

Supreme Court of Texas.

May 19, 1976.

Rehearing Denied June 16, 1976.

Meredith & Donnell, M. W. Meredith, Jr. and Finley L. Edmonds, Corpus Christi, for petitioners.

Mahoney, Shaffer, Hatch & Layton, Lee Mahoney, Corpus Christi, McMahon, Smart, Wilson, Surovik & Shuttle, Stanley P. Wilson, Abilene, for respondents.

SAM D. JOHNSON, Justice.

Union Construction Company, Inc., Mobile Pipe Constructors, Inc., and Dillingham Corporation brought this action against Black Lake Pipe Line Company to recover for extra work performed during the construction of a pipeline for Black Lake. The trial court rendered judgment on a jury verdict for Union Construction Company in the principal amount of $160,096.61, and for Mobile Pipe Constructors, Inc. and Dillingham Corporation in the principal amount of $95,428.50. The court of civil appeals affirmed, holding that the plaintiffs were entitled to recover upon the theory of *quantum meruit.* 520 S.W.2d 486. We reverse and render in part and reverse and remand in part.

On January 4, 1967 Mobile Pipe Constructors, Inc. and Dillingham Corporation, joint venturers known as Mobile Pipe-Dillingham (MPD), and Black Lake executed a prime contract that provided for the construction of a 125-mile pipeline 8⅝ inches in diameter beginning in Natchitoches Parish, Louisiana and extending to a point in Hardin County, Texas. The agreement contemplated that a new device known as a mobile pipe mill, owned by Mobile Pipe Constructors, Inc., would be employed to lay the pipe. The pipe mill was a large vehicle on caterpillar treads that moved slowly down the right-of-way fabricating pipe in 1,000- to 1,500-foot lengths from rolls of flat steel. If the mobile pipe mill performed on schedule, the completion date of the pipeline as determined by the contract was April 15, 1967. If the pipe mill did not perform properly, however, MPD was allowed a "reasonable period of time, but no later than June 15, 1967," to complete construction of the pipeline utilizing commercial mill pipe and conventional pipeline construction techniques. Contemporaneously with the execution of the prime contract, MPD subcontracted to McCathern, Inc. substantially all of the work under the prime contract with the exception of the operation of the pipe mill and the fabrication of the pipe. Subsequent to the execution of these contracts, work thereunder was begun.

Due to mechanical problems with the pipe mill and impediments created by the swamps and timberland through which the pipeline right-of-way passed, MPD failed to complete the project by April 15, 1967. Pursuant to the agreement, the completion date was then extended to June 15, 1967. In May 1967 the use of the pipe mill was discontinued. Shortly thereafter a dispute arose between MPD and McCathern, Inc. causing McCathern to withdraw from the job. Black Lake then notified MPD that it would terminate the agreement and employ another contractor unless MPD engaged a new subcontractor to proceed with the pipeline construction. Black Lake further offered to extend the completion date of the pipeline to August 1, 1967 if MPD engaged a new subcontractor.

On June 19, 1967 MPD entered into an agreement with Union Construction Company that provided for the construction by August 1, 1967 of a 67-mile stretch of the pipeline. The agreement between MPD and Union incorporated most of the provisions of the prime contract, and Union was responsible for all phases of construction on the 67-mile stretch of the pipeline. Meanwhile, MPD continued working toward completion of the remainder of the pipeline with its own crew. After Union began work on the project additional delays were encountered. MPD then sought and obtained from Black Lake an agreement extending the completion date from August 1, 1967 to August 15, 1967 plus a reasonable time for right-of-way cleanup work. It was not until November 28, 1967 that the cleanup work was finally completed to Black Lake's satisfaction.

The parties agree that Union and MPD have completed and have been paid for the work called for by the terms, plans, and specifications of their contracts. This lawsuit stems from a dispute among the parties regarding extra work.

MPD officially notified Black Lake as early as October 23, 1967 of its intent to file extra work claims. Both MPD and Union presented their claims to Black Lake in March of 1968. Black Lake rejected the

claims and this litigation ensued. Union, seeking a total recovery of $298,255.99, filed suit against Black Lake and MPD alleging that it was required to perform a considerable amount of additional or extra work in order to obtain approval and acceptance of its work by Black Lake Pipe Line Company. MPD answered and filed a cross claim against Black Lake alleging that Black Lake required them to perform work in excess of that required by the contract and claiming damages in the amount of $346,966.56.

The items of extra work complained of by Union and the respective jury awards for such items were as follows:

1. Excessive work performed in uncovering, for additional inspection, pipe which had already been placed in the pipeline ditch with the approval of Black Lake, $3,120.31;

2. Additional costs resulting from the requirements by Black Lake that inside air clamps rather than conventional outside clamps be employed in the pipe alignment operation, $3,547.95;

3. Additional costs resulting from the requirements made during the course of the work that Union add a second spread of men and equipment, $109,415.50;

4. Additional costs resulting from the firing by Black Lake of a welder-employee of Union (no award was made for this item of extra work because the jury failed to find that the firing of the welder caused an increase in Union's cost of performing the work);

5. Excessive work performed in moving and returning equipment and personnel to and from construction locations caused by the failure of Black Lake to keep available the line pipe that it was obligated to furnish, $6,388.85;

6. Excessive work performed in the removal of stumps, brush, tree limbs, and other debris from off-right-of-way areas, $12,862.94;

7. Excessive work performed in reworking the crown over portions of the pipeline ditch, $6,833.75;

8. Excessive work performed in the cleanup operations on the right-of-way, $10,722.40;

9. Excessive work performed in the construction of terraces across the pipeline ditch to direct the flow of water into natural drainage courses, $5,893.51;

10. Excessive work performed in disking pastureland, $1,311.40.

The items of extra work complained of by MPD and the respective jury awards for such items were as follows:

11. Excessive work performed in the cleanup operations on the right-of-way, $32,244.75;

12. Excessive work performed in the construction of terraces across the pipeline right-of-way to direct the flow of water into natural drainage courses, $39,410.25;

13. Excessive work performed in the removal of stumps, brush, tree limbs, and other debris from off-right-of-way areas, $22,200.50;

14. Excessive dredging at the tailrace of the Toledo Bend Dam, $1,573.00;

15. Additional cost caused by laying more line river pipe at river crossings than was required by the contract specifications (no award was made for this item of extra work because the jury failed to find that Black Lake required the work or received any benefit therefrom).

Although Union was not a party to the prime contract with Black Lake, Union alleged in its petition that it had a direct contractual relationship with Black Lake and that throughout construction of the pipeline Black Lake's representatives on the job directed and supervised Union's employees in the performance of their work. Union further stated that in order to obtain Black Lake's approval and acceptance of the work it was required to perform services and furnish materials over and above the requirements of the plans and specifica-

tions for the job. Union alleged that the interpretation of the contract specifications by Black Lake's representatives was unreasonable, arbitrary, and capricious. The legal theories upon which Union sought to impose liability upon Black Lake were (1) express contract, (2) *quantum meruit,* (3) economic duress or business compulsion, and (4) contract interference.

In answer to Union's petition MPD alleged that all work for which Union sought recovery was ordered and required by Black Lake and that all damages sustained by Union were the consequences of Black Lake's actions. MPD's cross claim against Black Lake closely paralleled the grounds stated in Union's petition. In answer to Union's petition and MPD's cross claim Black Lake set up several defenses, including (1) that Union and MPD failed to comply with the method of submitting extra work claims provided for in the contract, (2) that the decisions of the inspectors on the job were final and conclusive as to whether the work was satisfactorily performed, (3) that Union lacked privity of contract, (4) that the contractors waived any right to claim compensation for the extra work, and (5) that neither Union nor MPD performed any work over and above that required by their contracts.

One hundred fifty-three special issues were submitted to the jury. It is undisputed that the jury answers to the special issues preclude a recovery by Union for extra work caused by the firing of its welder (item 4) and by MPD for extra work involved in the laying of line river pipe (item 15). The special issues concerning extra work were submitted in clusters; most of the extra work clusters inquired (a) whether the extra work was required by Black Lake, (b) whether Black Lake refused its approval of the project unless the extra work was performed, (c) whether such refusal was arbitrary and capricious,[1] (d)

whether in performing the extra work the contractor was under duress[2] by Black Lake, (e) damages, (f) whether the contractor by its acts, conduct or silence waived any right it might have had to assert a claim for additional compensation, and (g) whether the contractor by its acts, conduct or silence led Black Lake to believe that no claim for additional compensation would be made. With the exceptions noted below, the issues pertaining to each of the items of extra work were submitted in the form described above (with some minor variations), and the jury made findings favorable to Union and MPD with respect to all such issues.

The jury did not answer certain special issues favorably to the contractors. With respect to Union's claim for excessive disking work in the pastureland (item 10), the jury failed to find that Black Lake's refusal to approve the work was arbitrary and capricious or that the work was performed under duress. Union received a negative response to some of the special issues regarding its claim for adding a second spread of men and equipment (item 3). The jury found that Black Lake required the addition of the second spread and that Union was acting under duress in complying with such requirement, but failed to find that the requirement of the second spread was arbitrary and capricious. The jury also failed to find that Union could have completed its portion of the pipeline project by the completion date, August 15, 1967, without the addition of the second spread of men and equipment. With respect to Union's claims for additional costs resulting from the use of inside air clamps (item 2), the jury failed to find that Black Lake refused to approve Union's pipe welding procedure without the use of such clamps. Consequently, the jury did not answer the special issue inquiring whether Black

1. The charge of the court defined "arbitrary and capricious" as "willful and unreasoning action without due consideration and in disregard of the facts, circumstances, and the rights of other parties involved."

2. The charge of the court defined "duress" as "any unlawful or unconscionable coercion of another, either mental, physical, economic or otherwise, causing him to act contrary to his own free will or to submit to a situation or condition against his own volition or interest."

Lake's refusal was arbitrary and capricious, though the jury did find that in the employment of inside air clamps Union was acting under duress by Black Lake. Finally, the cluster of special issues pertaining to MPD's dredging work (item 14) at the tailrace of the Toledo Bend Dam should be noted. The jury found that MPD was required by Black Lake to do more excavation than was contemplated by the plans and specifications. However, no special issues were submitted that inquired whether Black Lake's requirement was arbitrary and capricious or whether MPD was acting under duress in performing the extra excavation work.

The trial court rendered judgment for Union and MPD against Black Lake on all of their claims for extra work, except Union's claim for the firing of its welder and MPD's claim for the additional line river pipe. In Union's action against MPD the trial court rendered a take-nothing judgment. The court of civil appeals, without discussing the other theories upon which Union and MPD sought recovery, held that Union and MPD were entitled to recover against Black Lake in *quantum meruit.* The court of civil appeals also held, in response to points of error assigned by Black Lake, that the summaries of Union's and MPD's voluminous business records were erroneously admitted into evidence to support the extra work claims. The court further held that despite the erroneous admission of the summaries, there was sufficient evidence in the record to support the jury findings on damages. In response to Black Lake's points complaining of the trial court's award of prejudgment interest, the court of civil appeals originally held that Union's and MPD's pleadings were not sufficient to support the award. On motion for rehearing the court of civil appeals changed its position and upheld the award of prejudgment interest.

We will consider, first, whether Union and MPD are entitled to recover against Black Lake upon any of the four legal theories presented; namely, express contract, *quantum meruit,* economic duress or business compulsion, and contract interfer-

ence. Next, we will determine whether the trial court committed reversible error in admitting Union's and MPD's claim summaries. Finally, we will decide whether Union and MPD are entitled to prejudgment interest.

### I.

We hold, as did the court of civil appeals, that extra work performed by Union and MPD is recoverable in *quantum meruit.* We delete two awards for extra work from Union's recovery because the work performed was not extra. Since it is necessary to remand the case, at least in part, we deem it appropriate to provide some clarification of the issues raised in order to minimize the difficulties involved in the next trial of this rather complex case.

We begin with the premise that the right to recover in *quantum meruit* is based upon a promise implied by law to pay for beneficial services rendered and knowingly accepted. *Davidson v. Clearman,* 391 S.W.2d 48 (Tex.1965). If a valid express contract covering the subject matter exists there can be no recovery upon a contract implied by law. *Woodard v. Southwest States, Inc.,* 384 S.W.2d 674 (Tex.1964). However, the existence of an express contract does not preclude recovery in *quantum meruit* for the reasonable value of services rendered and accepted which are not covered by the contract. *City of Galveston v. O'Mara,* 146 S.W.2d 416 (Tex.Civ. App.—Galveston 1940), *affirmed as correctly announcing the law,* 138 Tex. 16, 155 S.W.2d 912 (1941).

The central issue is whether the alleged extra work was required of Union and MPD by their respective contracts. If the work was required by the contracts, Union and MPD must look to the contracts for compensation. *Dallas Electric Supply Co. v. Branum Co.,* 143 Tex. 366, 185 S.W.2d 427 (1945). In determining whether the work was required by the contracts we must determine (1) whether the work was extra and (2) whether the contracts made provision for the type of extra work performed.

■ 1. *Was the work extra?* We hold that Union's claim for additional costs incurred because of Black Lake's failure to furnish the necessary line pipe (item 5) is not a claim for extra work and is not recoverable in *quantum meruit.* This is not a claim for beneficial services rendered and knowingly accepted; it more closely resembles an action for breach of contract. However, Union has not alleged the existence of any agreement between Union and Black Lake obligating Black Lake to furnish the necessary pipe to Union. We recognize that there were provisions in the prime contract dealing with Black Lake's obligation to furnish commercial mill pipe to MPD, but Union was not a party to the prime contract. Union might have had an action for breach of contract against MPD because, under section 1.4 of the technical specifications in the subcontract, MPD was obligated to furnish the pipe necessary for the job. This question is not before us, however, because Union did not appeal from its take-nothing judgment against MPD.

■ A major question in this case is whether Black Lake's requirement that Union employ a second spread of men and equipment (item 3) constituted extra work. Black Lake contends that sections 7 and 15 of the general conditions in the prime contract authorized it to require a second spread of men and equipment to complete the job on time. These sections of the general conditions provide in part:

"7. SHUT DOWNS

"If Contractor is responsible for a delay in progress of the work, Contractor shall, without additional cost to Company, work overtime and utilize such additional equipment as may be necessary to eliminate delay in final completion of the contract.

" . . . .

"15. DEFAULT OF CONTRACTOR

" . . . if Contractor shall refuse or fail to supply enough properly skilled workmen, equipment, supplies, or materials to perform the work; or shall fail in any respect to prosecute the work with promptness and diligence; or shall fail to discharge any of the obligations assumed by him in executing the attached Agreement; Company may, without prejudice to any other right or remedy, by giving seven (7) days' notice in writing to Contractor, terminate the Agreement and Contractor shall discontinue any further work thereunder."

In view of the contract provisions noted above, we conclude that Black Lake was entitled to require the addition of a second spread of men and equipment if the work was behind schedule. At trial Union attempted to prove that the work could have been completed on time without the addition of a second spread. However, the jury answered, "We do not," to a special issue inquiring whether Union could have completed its portion of the project as a pipeline ready to receive and transport petroleum products by August 15, 1967 without a second spread of men and equipment. Furthermore, in response to another special issue, the jury failed to find that the requirement of the second spread was arbitrary and capricious.

In order to avoid the effect of such unfavorable jury findings, Union contends that sections 7 and 15 of the general conditions did not authorize Black Lake to require additional men and equipment if the delays in the construction schedule were caused by severe weather and other conditions beyond Union's control. Union's contention is based on section 6 of the general conditions, the *force majeure* provision, and the evidence in the record indicating that severe weather conditions were encountered during construction of the project. The simple answer to Union's contention is that it failed to obtain any jury findings as to the length of the delays caused by severe weather conditions; there is, therefore, no basis for holding that Black Lake exceeded its contractual rights by requiring the addition of a second spread. On the contrary, the jury findings contained in the record indicate that Black Lake was authorized by sections 7 and 15 of the general conditions to require the second spread in order to

assure that the job would be completed on time. We therefore hold that Union failed to prove that the second spread constituted extra work beyond the requirements of the contract.

▇▇ Black Lake finally contends that the work performed by Union and MPD was not extra because it was ordered by Black Lake's inspectors on the job, and the inspectors' decisions were made final and conclusive as to whether the work was satisfactorily completed. The provisions in the prime contract and the subcontract dealing with the authority of the inspectors are quite similar. Union's subcontract contains the following provision:

"8. INSPECTION OF WORK BY COMPANY AND/OR OWNER REPRESENTATIVES

"Company and/or Owner will maintain on the job such representatives as it may deem necessary for the purpose of inspecting and testing all work performed hereunder and insuring the satisfactory performance and completion thereof; and it is agreed that the decision of such representatives shall be final and conclusive as to whether various phases of the work to which their attention is drawn is satisfactorily performed and completed in accordance with these General Conditions, the attached Agreement, Technical Specifications, and exhibits, and the drawings or other attachments listed in or referred to herein. However, no express, implied, or tacit approval by an on-the-job Company and/or Owner representative of Contractor's performance of any phase of the required work which such a representative shall have inspected shall constitute final acceptance thereof by Company, and/or Owner."

We note that the provisions contained in both the prime contract and the subcontract state that the inspectors' decisions were *not* binding upon Black Lake. The inspectors' decisions were final and conclusive only as to the contractors, Union and MPD. This fact distinguishes the number of cases cited by Black Lake. *State v. Martin Bros.,* 138 Tex. 505, 160 S.W.2d 58 (1942); *Austin*

*Bridge Co. v. Teague,* 137 Tex. 119, 152 S.W.2d 1091 (1941); *City of San Antonio v. McKenzie Const. Co.,* 136 Tex. 315, 150 S.W.2d 989 (1941). Each of the cases cited by Black Lake involved a contract providing that the decision of the architect or engineer bound *all* parties. In deciding those cases we refrained from substituting our judgment for that of the architect or engineer, and we held that the decision of the architect or engineer is final and conclusive in the absence of fraud, misconduct or gross mistake.

The instant case is closer to the line of cases dealing with contracts which provide that performance shall be to the satisfaction of one of the parties to the contract. The general rule in such cases is that the judgment of the party regarding the adequacy of performance will be upheld if made in good faith. Annot., 44 A.L.R.2d 1114. Professor Williston explained why the courts imply a good faith requirement in such cases:

"It has been questioned whether an agreement in which the promise of one party is conditional on his own or the other party's satisfaction contains the elements of a contract—whether the agreement is not illusory in character because conditioned upon the whim or caprice of the party to be satisfied. Since, however, such a promise is generally considered as requiring a performance which shall be satisfactory to him in the exercise of an honest judgment, such contracts have been almost universally upheld." 5 Williston on Contracts § 675A, at 189–90.

We conclude that the instant case is closer to the line of cases discussed by Professor Williston because Black Lake's authority to overrule the inspectors' decisions put the final decision regarding adequacy of performance in Black Lake's hands. In reality, Black Lake's satisfaction was the conclusive test of whether the work was properly performed. When the inspectors ordered Union and MPD to perform extra work, the order was effective only because Black Lake let it stand.

With regard to construction contracts providing that performance shall be to the satisfaction of one party, most courts have applied an objective test in determining whether that party acted in good faith. 5 Williston on Contracts § 675B, at 210; 3A Corbin on Contracts § 645, at 85; Annot., 44 A.L.R.2d, *supra;* 17A C.J.S. Contracts § 495(2), at 722. We adopt the reasonableness test in the instant case for determining whether to uphold the decisions of Black Lake's inspectors. Union and MPD are entitled to recover for extra work required by the inspectors only if they can prove that the requirements imposed by the inspectors were not reasonably within the scope of the technical specifications.

█ 2. *Was the extra work covered by the contracts?* Both the prime contract and the subcontract contain the following provisions (with minor variations) relative to extra work:

"9. EXTRA WORK

" . . . .

"(b) The amount of any increase or decrease in the consideration payable to Contractor resulting from a change in the scope of the work under the provisions of subparagraph (a) just above shall be determined, insofar as practicable, by the application of the prices listed in the Unit Price Schedule (Exhibit 'A') attached hereto. If it is not practicable to determine the amount of any such increase or decrease from the Unit Price Schedule, then the amount of such increase or decrease shall be determined by the application of the prices, rates, or charges in the Wage Rate Schedule and the Equipment List and Rental Schedule attached to Exhibit 'A'. If for any reason the amount of any such increase or decrease cannot be practicably determined by either of the two methods just hereinabove prescribed, then the amount of such increase or decrease shall be determined by negotiation and reduced to writing by Company and Contractor.

" . . . .

"10. CHANGES, ALTERATIONS, AND ADDITIONS

"(a) Company may, at any time before completion of the work, make amendments, deletions, or additions to the Technical Specifications or the attachments thereto so long as such changes do not enlarge or diminish the scope of the work to be done under this contract. Contractor agrees that he will comply with such changes and that if such changes result in any increase or decrease in the cost to Contractor of performing this contract, then there shall be a corresponding increase or decrease in the consideration to be paid Contractor under this Contract. "(b) The amount of any increase or decrease in consideration payable to Contractor resulting from changes, alterations, or additions of the type described in subparagraph (a) just above shall be determined in the same manner prescribed in subparagraph (b) of the preceding paragraph captioned 'Extra Work.'

"(c) If a change of the type contemplated by subparagraph (a) of this paragraph captioned 'Changes, Alterations, and Additions' if effected, which necessitates Contractor's furnishing additional materials, Company shall pay Contractor for furnishing such materials on the basis set forth in Exhibit 'A'.

" . . . .

[EXHIBIT "A"] "PROCEDURE FOR SUBMITTING EXTRA WORK INVOICES: Upon the completion of a work day involving any work which is compensable at the prices, rates and charges set forth either in the Wage Rate Schedule or the Equipment List and Rental Schedule attached to this Exhibit 'A', the following procedure shall be observed:

"(a) Contractor and Company representatives shall jointly sign five (5) copies of the 'Daily Work Sheet,' Form SPL–355, verifying the number of hours worked, names, classifications, and rates of men and equipment involved and material used.

"(b) Original and one copy of Form SPL–283 shall be given to Contractor, for records and invoice information. The three copies of SPL–283 shall be distrib-

uted by originating office in accordance with Company instructions.

"(c) Upon completion of the work covered by the specific 'Work Order', original copies of Daily Work Sheets along with supporting receipted invoices for materials that Contractor purchased for said Work Order shall be attached to Contractor's invoice rendered to Company. Contractor's invoice shall list the total labor, materials, equipment etc. required to complete the work described on the order and work order shall be jointly signed by Contractor's authorized representative and Company representative. . . . "

Black Lake argues that the above contract provisions authorized it to change the technical specifications and require any work necessary to comply with the amended specifications. Union and MPD contend, on the other hand, that their contracts required them to perform extra work only upon the filing of *written* amendments to the technical specifications. It is undisputed that the technical specifications were not amended to cover the items of extra work in question. According to Black Lake, it is unimportant whether amendments to the technical specifications were oral or written. We disagree. Both the prime contract and the subcontract contemplated that the contractors' obligations would be determined by the written agreement. Section 1 of both contracts provides that "no modifications or supplement to any part of said entire agreement so constituted shall hereafter be made except by written agreement signed by both parties." Black Lake could order work in excess of the technical specifications, but Union and MPD were not bound if the specifications were not amended to cover the work. We find it quite understandable that Union and MPD chose not to be bound to perform extra work unless Black Lake amended the technical specifications in writing. This was the contractors' protection against being obligated to perform work that Black Lake did not consider extra and for which Black Lake was unwilling to pay additional compensation.

Our holding that the extra work performed by Union and MPD is beyond the scope of their contracts disposes of Black Lake's contention that the contractors forfeited their extra work claims by failing to comply with the contract procedures for submitting such claims. Union and MPD were not required to follow the prescribed procedure for submitting extra work invoices unless the extra work was "compensable at the prices, rates and charges set forth either in the Wage Rate Schedule or the Equipment List and Rental Schedule" in the contracts. The extra work performed by Union and MPD was not compensable under the schedules set forth in the contract because the technical specifications were not amended in writing to cover the extra work. Thus, the contractors were not required to submit extra work invoices in compliance with the contract procedure. The contractors' right to refrain from submitting extra work invoices unless the work was required in writing protected them from jeopardizing their positions by filing claims after Black Lake had already refused to pay for the work.

Black Lake contends that the instant case is controlled by *State v. Martin Bros., supra.* In *Martin* the contractors filed a claim for extra work performed in the construction of a highway. The highway department contract provided that no extra work should be performed until a supplemental agreement was executed or an extra work order was submitted by the engineer on the job. Observing that the contractor failed to comply with these contract conditions, this court denied the contractor's claim for extra work. *Martin* is distinguishable from the instant case because section 10 of Union's and MPD's contracts did not provide that work called for by a change in the technical specifications could not be performed until the filing of a written amendment to the technical specifications. Although the contractors were not bound to perform the extra work in the absence of a written amendment to the specifications, there is nothing in the applicable provisions of the contract to prevent Union and MPD

from recovering for the extra work that they performed.

Since we have held that Union and MPD may recover for their extra work in *quantum meruit,* we decline to rule on the other legal theories advanced by the contractors. However, our holding that Union may not recover in *quantum meruit* upon its claim for the second spread (item 3) or its claim for Black Lake's failure to furnish line pipe (item 5) compels us to at least show that these claims could not succeed upon any of Union's other legal theories. We have ruled out a contractual recovery by Union for either of the claims because there was no privity of contract between Union and Black Lake. *George v. Hall,* 371 S.W.2d 874 (Tex.1963).

■ Turning to Union's alternative legal theory of economic duress, we sustain Black Lake's contention that there is no evidence to support the jury finding that Union employed a second spread of men and equipment as a result of duress by Black Lake. The prime contract entitled Black Lake to terminate the contract if the contractors failed to provide enough men and equipment to complete the project on schedule. In view of this contract provision and the jury finding that a second spread was necessary to complete the project on schedule, we hold that the alleged threat by Black Lake to terminate the contract and withhold payments unless Union added a second spread did not constitute unlawful or wrongful conduct sufficient to support a finding of duress. *Ward v. Scarborough,* 236 S.W. 434 (Tex.Com.App.1922, jdgmt adopted). The claim for Black Lake's failure to furnish line pipe does not fit within the theory of economic duress, and there was no finding of duress by the jury with regard to this claim. Finally, the legal theory of contract interference does not support Union's recovery for the second spread or for the additional costs incurred because of Black Lake's failure to furnish line pipe. An important element in a right of recovery for contract interference is that the interference must be without right or justification. Interference with contractual relations is privileged where it results from the exercise of a party's own rights or where the party possesses an equal or superior interest to that of the plaintiff in the subject matter. *Terry v. Zachry,* 272 S.W.2d 157 (Tex.Civ.App.—San Antonio 1954, writ ref'd n. r. e.); 45 Am.Jur.2d Interference § 27, at 304–05. Since Black Lake was entitled by its prime contract to require that the contractors provide enough men and equipment to complete the project on time, Black Lake was justified in requiring that MPD, through its subcontractor, Union, add a second spread of men and equipment. Union's claim for the additional costs incurred because of Black Lake's failure to provide the necessary line pipe is not recoverable upon the theory of contract interference because there is no allegation that Union's rights under its subcontract with MPD were affected by Black Lake's failure to furnish the line pipe.

■ Having considered the arguments relative to Black Lake's liability for the extra work, we now consider what disposition should be made of the various extra work claims. The judgment for Union upon its claim pertaining to the second spread of men and equipment (item 3) must be reversed and judgment rendered that Union take nothing. The jury findings were adverse to Union's right of recovery for this item of extra work upon any of the legal theories pleaded. The judgment for Union upon its claim pertaining to Black Lake's failure to furnish pipe (item 5) also must be reversed and judgment rendered that Union take nothing. This claim was not recoverable under any of the legal theories pleaded. *Williams v. Safety Casualty Co.,* 129 Tex. 184, 102 S.W.2d 178 (1937). The judgment for Union upon its claims pertaining to the disking work (item 10) and the air clamps (item 2), and the judgment for MPD upon its claim for the dredging work (item 14) must be reversed because there were no jury findings that the inspectors' decisions were unreasonable. However, we remand the portion of the cause based upon these claims for a new trial in the interest of justice because the

claims were tried on the wrong theory. *City of San Antonio v. Pigeonhole Parking of Texas,* 158 Tex. 318, 311 S.W.2d 218 (1958); *American Surety Co. of New York v. Fenner,* 133 Tex. 37, 125 S.W.2d 258 (1939); *Colbert v. Dallas Joint Stock Land Bank of Dallas,* 129 Tex. 235, 102 S.W.2d 1031 (1937). The judgments for the remaining extra work claims must be reversed and remanded for a new trial because of defects in the proof of damages, discussed below.

## II.

Due to the extensive records accumulated by Union and MPD during the construction of the pipeline, both attempted to prove their damages by introducing summaries of their records. The summaries were admitted by the trial court over Black Lake's strenuous objections that they were hearsay and not the best evidence of the contractors' records. The court of civil appeals held that the summaries were not admissible, stating:

"In many particulars which we need not detail, the records supporting the summaries in question were prepared long after the events recorded therein. Some were made in connection with the preparations of the summaries. And, in part, the summaries were based upon oral statements and assumptions. Moreover, portions of the underlying records were not produced in court and were apparently unavailable at time of trial; and there is no showing that all of the supporting records have ever been made available to Black Lake. The summaries were not admissible." 520 S.W.2d 486 at 492–93.

Although the court of civil appeals held that the summaries were not admissible, it concluded that their admission into evidence did not constitute reversible error because other evidence in the record supported the jury findings. In its application for writ of error Black Lake contends that the summaries were not admissible, that there was no other evidence to support the jury findings of damages, and that the admission of the summaries was so prejudicial that it constituted reversible error regard-less of other evidence which tends to support the jury findings.

In view of significant differences between the summaries introduced by Union and MPD we consider the admissibility of the summaries separately. However, there are well-established principles applicable to all summaries of voluminous records. Since a summary is no more admissible than the underlying records, the admissibility of the underlying records must be established. *Dallas Railway & Terminal Co. v. Guthrie,* 146 Tex. 585, 210 S.W.2d 550 (1948). In order to overcome the hearsay objection to the admissibility of the underlying records, a proper predicate must be laid for the admission of such records as business records in accordance with Article 3737e, Texas Revised Civil Statutes Annotated. *Jackson v. Fontaine's Clinics, Inc.,* 499 S.W.2d 87 (Tex.1973). "This statute creates an exception to the hearsay rule and makes a 'memorandum or record of an act, event or condition * * * competent evidence of the occurrence of the act or event or the existence of the condition' provided the identity and mode of preparation of the memorandum or record are established as provided therein." *Cooper Petroleum Co. v. LaGloria Oil and Gas Co.,* 436 S.W.2d 889, 891 (Tex.1969).

A further objection to the admissibility of summaries is that they are not the best evidence of the underlying records. However, where the underlying records are so voluminous that it would be impractical to require the production of the entire mass to be perused by the jury or read aloud to them, courts have relaxed the best evidence rule by allowing written summaries of the underlying records or testimony by a qualified witness summarily stating, the results of an examination of the records. *Cooper Petroleum Co. v. LaGloria Oil and Gas Co., supra;* 2 McCormick & Ray, Texas Evidence § 1566, at 413 (2d ed. 1956); 4 Wigmore, Evidence § 1230, at 535 (Chadbourn rev. 1972). Although the best evidence rule has been relaxed to permit secondary evidence of voluminous records, we have required, as a condition, that the underlying

records be brought into court or at least be made available to the opposing party in order that the correctness of the evidence may be tested by inspection or that the material for cross-examination may be available. *Lewis v. Southmore Savings Association,* 480 S.W.2d 180 (Tex.1972); *Dallas Railway & Terminal Co. v. Guthrie, supra*; 4 Wigmore, Evidence, *supra.* Texas courts have recognized that trial courts have wide discretion in determining whether summaries are necessary to expedite the trial. *Texas Whse. Co. of Dallas, Inc. v. Spring Mills, Inc.,* 511 S.W.2d 735 (Tex.Civ.App.—Waco 1974, writ ref'd n. r. e.); *Moore v. Moore,* 430 S.W.2d 247 (Tex.Civ.App.—Dallas 1968, writ ref'd n. r. e.); *Shelby County v. O'Banion,* 188 S.W.2d 195 (Tex.Civ.App. —Beaumont 1945, no writ). Similarly, it is for the trial court in the exercise of its discretion to determine whether the opposing party had an adequate opportunity to examine the records.

■ 1. *MPD*: MPD's claims against Black Lake were summarized in an exhibit that was designated MPD–11. MPD–11 was a letter written to Black Lake on behalf of MPD by its project manager, E. B. Pike. The body of the letter contained a narrative summary of the extra work performed by MPD and a demand for payment. Attached to the letter was an appendix that presented the method of computation used by MPD in determining the amount of its extra work claims. With respect to MPD's claims for excessive cleanup work and terracing, the total amount of the claims was determined by multiplying the number of additional days that MPD was engaged in cleanup and terracing work by the labor and equipment cost for a typical cleanup crew.

The labor and equipment cost for a typical crew was based on the wage rate schedule and the equipment list and rental schedule contained in the prime contract. In order to determine the number of days that the crew was engaged in additional cleanup and terracing work, MPD subtracted the number of days that it estimated would reasonably be necessary to complete the work from the number of days that its crew was actually engaged in such work. Specifically, MPD determined that it was actually engaged in cleanup and terracing work for a total of eighty-five days. MPD estimated that the cleanup and terracing work should have required no more than eighteen days, leaving sixty-seven days of additional or excessive work. Another portion of the appendix presented MPD's method of computing its claim for additional dredging work at the tailrace of the Toledo Bend Dam. A diagram in the appendix purports to show that MPD performed nearly one hundred percent more dredging work than was required by the specifications.

In its response to Black Lake's application for writ of error MPD does not seriously challenge Black Lake's contention that the exhibit was inadmissible; instead, MPD emphasizes that there is other evidence in the record to support the jury findings and that the erroneous admission of MPD–11 was harmless error. We hold that MPD–11 was inadmissible and that the trial court's error in admitting the exhibit requires that MPD's claims against Black Lake be reversed and remanded. Though MPD–11 was not purely a summary of MPD's records, there can be no doubt that significant portions of the exhibit purport to summarize the records. For example, in determining the number of days that MPD's forces were actually engaged in cleanup and terracing work, MPD–11 obviously relied on the records. On cross-examination E. B. Pike, the author of MPD–11, admitted that much of the cleanup and terracing work was performed before he was assigned to the job and that he had no independent knowledge of the dates on which the MPD forces were engaged in such work. Similarly, Pike admitted that the dredging work on the tailrace of the Toledo Bend Dam was performed before he arrived on the job and that he had no independent knowledge of such work.

Since much of the crucial data in MPD–11 was extracted from MPD's records, it was incumbent on MPD to show (1) that the records were voluminous, (2) that the

records were admissible, and (3) that the records were accessible to Black Lake. That MPD's records were voluminous is beyond question; they were described as filling four or five file trunks. We are also satisfied that MPD's records were accessible to Black Lake. A staff attorney for Black Lake testified that he and other Black Lake officials examined the records prior to the trial and that MPD repeatedly offered to make available to Black Lake any of the records that were deemed necessary.

The fatal defect in MPD–11 is that the underlying records were never identified, described or shown to be admissible. *See Sherwin-Williams Company v. Perry Company,* 424 S.W.2d 940 (Tex.Civ.App.—Austin), *writ ref'd n. r. e. per curiam,* 431 S.W.2d 310 (Tex.1968). MPD did not even attempt to establish a predicate for the admissibility of its underlying records in accordance with Article 3737e, *supra.*

The erroneous admission into evidence of MPD–11 constitutes reversible error because MPD–11 was the only proof of damages presented by MPD. The bulk of MPD's testimony at the trial was given by E. B. Pike, the project manager and author of MPD–11. Though Pike testified at length about the nature of the extra work performed, the only testimony by Pike regarding MPD's damages was his explanation of the computations in MPD–11 and his statement that the estimates of damages in the exhibit were fair and reasonable. Since Pike's testimony was based on the figures set forth in the exhibit, it was no more admissible than MPD–11.

■ 2. *Union:* Each of Union's ten extra work claims was supported by an exhibit indicating the total labor and equipment cost for the extra work. The exhibits were prepared in October 1967 under the supervision of Union's accountant, Norman Ransleben. In preparing the exhibits Ransleben was assisted by two or three other accountants and various Union personnel. Each exhibit contained an invoice setting forth the total charges for extra labor and equipment. Attached to the invoices were daily time reports showing on a daily basis

the specific men and equipment engaged in the particular type of extra work. The daily time reports were summaries of the original time reports turned in by the foremen on the job. The original time reports were voluminous; Ransleben testified that as many as thirty or forty reports were turned in each day during the project.

Unlike MPD, Union presented extensive testimony relative to the admissibility of the underlying records. The president of Union testified at length about Union's record-keeping procedures. Testimony about the method of preparation of the daily time reports was given by other Union personnel, including a superintendent on the Black Lake job, a foreman, and the clerk who prepared the payroll records. Several of the time sheets and other underlying records were produced at trial by Union at Black Lake's request. Black Lake also introduced a box containing copies of time sheets and journals that it obtained from Union. Based on the records in Black Lake's possession and the testimony of Black Lake's staff attorney who obtained the records from Union, we are satisfied that all of the underlying records possessed by Union were accessible to Black Lake.

The trial of this case lasted over eight weeks. We appreciate the practical problems encountered by Union in presenting a mass of records and documents to the jury and we reaffirm the discretion of trial courts to expedite trials of such complicated cases. Nevertheless, we cannot approve Union's method of proving its damages from the records introduced. The judgment for Union upon its claims against Black Lake must also be reversed.

The daily time reports attached to each Union exhibit were not mere summaries of Union's original records. Much of the information on which the time reports were based came directly from Union employees who assisted Ransleben's accountants in understanding the original records. Such assistance was necessary because the original time reports did not segregate the men and equipment engaged in extra work from those performing the normal work required

by the contract. For example, the original time reports for the cleanup crew specified that the entire crew was engaged in "cleanup." When the summaries of the original records were prepared, the cleanup foreman told the accountants which specific members of the crew were engaged in extra work.

Since the summaries prepared by the accountants incorporated the statements and opinions of the cleanup foreman as well as other Union personnel, the summaries constituted inadmissible hearsay. Union contends that it would have been impractical for its foremen to testify at trial as to which specific members of their crews were engaged in extra work on each day of the project. However, Union had other alternatives for proving its damages. It might have closely estimated the number of days that extra work was performed and supported the estimate by testimony describing the extent of the work. Union's summaries purport to give exact figures representing the cost of the extra work performed. The original records on which the summaries were based, however, do not contain sufficient information to arrive at such figures. Consequently, the method employed by Union to prove its damages was calculated to mislead the jury.

Union contends that the erroneous admission of its exhibits is not reversible error because there is other evidence in the record to support the jury findings. We disagree. Though Union's witnesses described the extra work in some detail, their testimony did not provide the jury with any basis for determining the amount of damages. Furthermore, the testimony of Union's witnesses that the charges set forth in the exhibits were fair and reasonable does not constitute any additional evidence to support the jury findings on damages.

### III.

The trial court awarded Union and MPD prejudgment interest at the rate of six per-

cent from the date the pipeline was completed, November 28, 1967, to the date of judgment, December 29, 1972. The court of civil appeals affirmed the award of prejudgment interest, holding:

"Accordingly, Union and MPD were entitled to interest at the legal rate of 6% on their recoveries from November 27, 1972 [*sic*]³—the date Black Lake acknowledged completion of the project and accepted it—until the date of judgment, as a matter of law, whether prayed for or not. In any event, the prayers of Union and MPD, in the absence of exceptions, were sufficient to support the awards of interest." 520 S.W.2d 486 at 494.

Black Lake argues that the pleadings of Union and MPD are insufficient as a matter of law to support any recovery of prejudgment interest. Union and MPD reply that the prayers contained in their petitions adequately support the prejudgment interest awards. It is undisputed that if the awards were upheld, the interest began to accumulate on November 28, 1967.

Union's third amended original petition contained the following prayer:

"WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that after due notice and trial, Plaintiff have and recover judgment of and from Defendants for the reasonable value of the excessive, extra or additional work performed, for damages as hereinabove set out, for reasonable attorney's fees, *interest* and costs, and for such other and further relief, both general and special, to which Plaintiff may show itself to be entitled." [Emphasis added.]

The wording of the prayer in MPD's cross claim does not differ substantially from Union's prayer. Both prayers expressly request an award of "interest."

It has long been a settled rule in Texas that where damages are established as of a definite time and the amount thereof definitely determinable, interest is recov-

3. The date Black Lake acknowledged completion of the project and accepted it was November 28, 1967. The court of civil appeals apparently made a clerical error in stating that November 27, 1972 was the date of completion.

erable as a matter of right from the date of the injury or loss. *Watkins v. Junker*, 90 Tex. 584, 40 S.W. 11 (1897). Prejudgment interest may be awarded on a recovery in *quantum meruit. Davidson v. Clearman, supra.* Although prejudgment interest is recoverable as a matter of right in certain cases, this court has not dispensed with the requirement that the petition contain pleadings to support an award of prejudgment interest. *International & G.N. Ry. Co. v. Lyon*, 112 Tex. 30, 243 S.W. 973 (1922). By failing to plead for prejudgment interest a plaintiff may waive his right to it. *Ewing v. Wm. L. Foley, Inc.*, 115 Tex. 222, 280 S.W. 499 (1926). We do not approve the court of civil appeals' statements that Union and MPD were entitled to prejudgment interest, "whether prayed for or not."

The question presented is whether a prayer for "interest," without more, constitutes sufficient pleadings to support an award of prejudgment interest. We considered this exact question in *Texas & N.O.R. Co. v. Dingfelder & Balish*, 134 Tex. 156, 133 S.W.2d 967 (1939). In *Dingfelder & Balish* the prayer in the plaintiff's petition, which was substantially similar to that of Union and MPD, was for damages "with interest." As in the instant case, the contention was made that the pleadings were not sufficient to support the award of prejudgment interest. Although the court's opinion did not expressly deal with this contention, we unmistakably held that the award of prejudgment interest was properly included in the judgment.

We hold that Union's and MPD's pleadings were sufficient to support the awards of prejudgment interest. If, as in the instant case, there is no controversy about the date of the injury or loss, the plaintiff's right to prejudgment interest does not depend upon the resolution of any fact issues. Consequently, a simple prayer for interest provides fair notice of the claim for relief. Black Lake cites numerous court of civil appeals decisions as holding that a simple prayer for interest is not sufficient to support an award of prejudgment interest. *City of Houston v. Anchor-Hocking Glass*

*Corp.*, 467 S.W.2d 677 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.); *Gulf States Paint Co. v. Kornblee Co.*, 390 S.W.2d 356 (Tex.Civ.App.—Texarkana 1965, writ ref'd n.r.e.); *Pereira v. Gulf Electric Company*, 343 S.W.2d 334 (Tex.Civ.App.—Waco 1960, writ ref'd n.r.e.); *Christie v. Harris County Fresh Water Supply Dist.*, 317 S.W.2d 219 (Tex.Civ.App.—Waco 1958, writ ref'd n.r.e.); *Davis v. Texas Boiler & Machinery Co.*, 242 S.W.2d 647 (Tex.Civ. App.—Fort Worth 1951, no writ). Only one of the decisions cited by Black Lake, *Gulf States Paint Co. v. Kornblee Co., supra*, dealt with a petition containing a prayer for interest. However, the award of prejudgment interest was reversed in *Kornblee* because the plaintiff failed to allege and prove the date of injury from which the prejudgment interest must be computed. In the instant case the date of injury is undisputed.

In view of our determination to reverse and remand the judgment upon all of Union's and MPD's claims for extra work, except Union's claims for the second spread (item 3) and for Black Lake's failure to furnish the necessary pipe (item 5), the respective awards of prejudgment interest must also be reversed and remanded. Black Lake asserts several other points of error primarily concerned with defects in the charge of the court. All of these points have been duly considered and are overruled.

In summary, the judgments of the trial court and the court of civil appeals awarding Union $109,415.50 upon its claim for the second spread (item 3) and $6,388.85 upon its claim for additional costs incurred because of Black Lake's failure to furnish the necessary line pipe (item 5) are reversed and judgment is here rendered that Union take nothing upon these claims. The judgments of the trial court and the court of civil appeals for Union and MPD upon the remaining extra work claims (items 1, 2, and 6 through 14), including the respective prejudgment interest awards, are reversed, that portion of the cause is severed and as

severed is remanded to the trial court for a new trial.