**DEAL DEVELOPMENT COMPANY et al., Appellants,**

v.

**AMARILLO CONCRETE CONTRACTORS, INC., Appellee.**

No. 5728.

Court of Civil Appeals of Texas, Waco.

July 28, 1977.

Thomas L. Case, Bickel & Case, Dallas, for appellants.

Gayle E. Oler, Dallas, for appellee.

## OPINION

JAMES, Justice.

This is a suit for breach of a construction contract. Pursuant to a jury verdict the trial court entered judgment for Plaintiff-Appellee, after allowing a counterclaim in favor of Defendant-Appellants. We reform and affirm.

Plaintiff-Appellee Amarillo Concrete Contractors, Inc. (hereinafter called "Amarillo") sued Defendant-Appellants Deal Development Co., a partnership (hereinafter called "Deal"), Equity Builders, Inc., and Kaiser Aetna, a partnership, for damages for breach of a written contract under which Amarillo agreed to complete certain construction work for Deal on an apartment project known as the Brookstone Apartments in Clearwater, Florida. The contract defined the work as "furnish all labor, materials, and equipment necessary to complete all foundations and flatwork." The contract price of $280,981.21 was increased by a change order for $16,965.00 which added about 10,000 linear feet of interior beams to the foundation, making a total contract price of $297,946.21. Defendant-Appellants asserted a counterclaim to the effect that Amarillo converted $16,965.00 worth of steel belonging to Deal.

The original contract was dated May 25, 1973, and was amended by a change order dated July 20, 1973; however, for purposes of this opinion the total agreement will be hereinafter referred to as the "contract."

Trial was to a jury which found:

(1) The ending date of "a reasonable period of time" in which Amarillo was to have commenced the actual construction of the foundations on the Brookstone project under its contract with Deal was December 1973.

(2) Before and up to December 1973, Amarillo was ready, willing, and able to commence the actual construction of the foundations on the Brookstone project under its contract with Deal.

(3) At some time during the summer of 1974 before August 29, 1974, Deal instructed Amarillo not to proceed further with its work under the contract.

(4) Under all the circumstances which existed on or before the occasion wherein Deal instructed Amarillo not to proceed, Amarillo had proceeded with due diligence under the contract.

(5) Deal paid Amarillo $22,410.93 pursuant to the contract.

(There was no Special Issue No. 6).

(7) In July 1974, Deal informed Amarillo that Deal had decided to postpone for the indefinite future the commencement of actual construction of the foundations of the Brookstone project.

(8) Up until July 1974 when Deal informed Amarillo that Deal was postponing indefinitely the construction under the contract, Amarillo had proceeded with due diligence under the contract with Deal.

(9) In July 1974, Deal informed Amarillo that Deal would probably not build the Brookstone project.

(10) Under all the circumstances which existed on or before July 1974 wherein Deal informed Amarillo that Deal would probably not build the Brookstone project, Amarillo had proceeded with due diligence under the contract.

(11) As of July 31, 1974, the cost to Amarillo to complete its obligations under the contract with Deal was $248,126.96.

(12) Amarillo actually spent $22,410.93 in performance of its obligations under the contract with Deal.

(13) From October 1973 up through the summer of 1974, Amarillo possessed the capability of performing its construction obligations under the contract.

(14) In November 1974 Deal made demand upon Amarillo to commence work on the Brookstone project.

(15) The jury failed to find that Amarillo's failure to commence work after the November 1974 demand by Deal constituted a repudiation or abandonment of the contract.

(16) In July 1974 Deal was the owner of the steel in question for the Brookstone foundations.

(17) Amarillo in July 1974 converted such steel to its own use on another project.

(18) The reasonable cash market value of the steel in question in July 1974 at its location in Clearwater, Florida, was $16,965.00.

(19) The jury failed to find that Amarillo's converting such steel to its own use constituted notice by Amarillo that it was renouncing or abandoning the Brookstone project.

(20) The jury failed to find that Amarillo by its acts or conduct in 1974 waived its rights to any benefits from the Brookstone project contract.

Pursuant to and in harmony with the jury verdict, the trial court entered judgment in favor of Plaintiff Amarillo against Defendants for $32,854.25 and costs, from which Defendants appeal.

Appellants assert ten points of error challenging the jury's answer to Special Issue No. 11, saying there is no evidence to support such finding, and that said finding is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. As hereinbefore stated, in answer to Special Issue No. 11 the jury found that Amarillo's cost as of July 31, 1974, to complete its obligations under its contract with Deal, was $248,126.96. Appellants contend that since this jury finding cannot stand, there is no basis upon which Plaintiff Amarillo can establish damages. We are of the opinion that there is ample evidence to support this jury finding in answer to Special Issue No. 11.

This case was tried, and properly so, upon the theory that the Plaintiff's measure of damages as contractor is the contract price less what it would cost Plaintiff to perform the contract to completion. *Carras v. Birge* (Dallas 1948) 211 S.W.2d 998, NRE; *Wynnewood Development Co. v. Belmares* (Eastland 1956) 295 S.W.2d 441, no writ.

Bearing in mind the above rule for Plaintiff's measure of damages, let us examine the mathematical consequences as the rule applies to the jury's answers to the applicable special issues: The contract price was undisputedly $280,981.21 plus a change order increasing it by $16,965.00, making a total contract price of $297,946.21. The payments made by Defendant-Appellants to Plaintiff Amarillo on the contract were found by the jury (Special Issue No. 5) to amount to $22,410.93. The contract price less the payments results in a net contract balance of $275,535.28.

The jury found in answer to Special Issue No. 11 that the cost to Amarillo to complete its obligations under the contract and change order was $248,126.96. From this the trial court subtracted the jury's finding of expenditures made by Amarillo of $22,410.93 (Special Issue No. 12) to arrive at Amarillo's unexpended cost of $225,716.03. Then, subtracting the unexpended cost of $225,716.03 from the net contract price of $275,535.28, the court arrived at Plaintiff Amarillo's gross damages of $49,819.25. From this amount, the trial court subtracted $16,965.00 (same being the value of the steel which the jury found Amarillo converted in answer to Special Issues Nos. 16, 17, and 18), to arrive at Plaintiff Amarillo's net damage of $32,854.25, which is the amount of the judgment Amarillo was awarded against Defendants.

We now revert to Defendant-Appellant's ten points of error wherein they challenge the legal and factual sufficiency of the evidence to support the jury's finding of $248,126.96 in answer to Special Issue No. 11. We are mindful of the rules laid down by our Supreme Court in weighing legal insufficiency and factual insufficiency points of error, and will not repeat them here. Suffice it to say that the evidence in the case

at bar is both legally and factually sufficient to support this jury finding, and all of Appellants' points of error in this connection are overruled.

The following is a synopsis of the evidence bearing upon the jury finding in question:

The Brookstone construction contract was only one of three contracts entered into between Amarillo and Deal on the same date of May 25, 1973, each contract being for the construction of one phase of a large apartment project in Clearwater, Florida. Phase one was called Brookgreen; the second phase was called Brookwood, while the third phase was called Brookstone, and was covered by the contract in question. Brookgreen and Brookwood were contiguous, and were separated from Brookstone only by a single street running between them. The combined total of all three projects was over six hundred apartment units. As stated, all three contracts bore the same date of May 25, 1973, and each of the three had a change order bearing date of July 20, 1973 for the adding of interior beams to the foundation. The same architect prepared the plans for all three projects (Edward T. Stefoniak); and the foundation designer, Victor Lissiak, testified that the revised plans for the foundations were identical on all three projects. Johnny Airhart, Defendants' construction coordinator, referred to all three projects as "the project in Clearwater," and testified that at the pre-construction conference in Florida, the sequencing of building the Brookstone, Brookwood, and Brookgreen Apartments was arranged and the three were basically treated as a unit. It is undisputed that Amarillo commenced the foundations on Brookwood and Brookgreen in October, 1973, the flatwork (sidewalks, etc.) in the spring of 1974, and both of these contracts were fully performed and completed by Amarillo to Deal's satisfaction. At the pre-construction conference hereinabove referred to, Mr. Airhart, Deal's construction coordinator, directed Amarillo to the effect that the Brookwood and Brookgreen work would be completed before Brookstone work would be commenced.

Mrs. Karen Cobb, secretary-bookkeeper for Amarillo, was a witness for Plaintiff. She brought into the courtroom two packing boxes full of records and five books of records belonging to Amarillo, of which she was the custodian at all times material to this suit. This data included all the business records pertaining to the Brookwood and Brookgreen jobs. She testified that all of these records brought into court were made and kept in the regular course of business; that it was in the regular course of business of Amarillo for an employee or representative with personal knowledge of the act, event, or condition recorded to make the records or to transmit information to be included in the records; and that the records were made at or near the time of the act, event, or condition recorded or reasonably soon thereafter. Mrs. Cobb's records included those of all material costs, labor costs, subcontract costs and direct job costs on Brookwood and Brookgreen. Amarillo's home office was in Dallas, Texas. The project supervisor in Florida transmitted to her the information from the field as to the costs of materials, labor and subcontracts used in the project, and Mrs. Cobb wrote checks in payment of same. At the time she issued each check she made a check stub and a record of the check on a transmittal form to the computer used by the company. She had personal knowledge of every check which went to the computer. The information which she sent to the computer came back to Mrs. Cobb on a computer form, which she personally verified from her own records.

Mrs. Cobb produced and identified the monthly accounting envelopes, which included the bank statements, check stubs, cancelled checks and transmittal forms (to the computer) for each month during the periods of 1973 and 1974 in which the Brookwood and Brookgreen jobs were going on. She had personally written all the said checks and check stubs and transmittal forms. She testified that it was possible to ascertain what costs had been paid by Amarillo on the Brookwood and Brookgreen projects by examining the monthly account-

ing envelopes, and that all the envelopes before the court contained records as to the costs or expenditures incurred by Amarillo on the Brookwood and Brookgreen jobs.

Mrs. Cobb testified that while she did not have personal knowledge that the labor in Florida was actually done or that the materials were actually furnished, as stated in the information sent to her by M. A. Boyce, the field superintendent in Florida, she did know that it was in the regular course of business of Amarillo for someone with personal knowledge, an employee or representative of the company, to send her that information, which is the information in the exhibits which she received from Florida and had identified in court, and the records before the court were prepared from such information in that regular course of business.

All of these records were brought into court, identified, and made available to Defendant-Appellants for purposes of audit, cross-examination or whatever use Appellants had for them. They were marked as exhibits, but were not offered in evidence.

Mrs. Cobb testified that she had prepared a summary which she took from the computer records, which she had personally verified and checked against her own records. This summary was a list of all costs on the Brookwood and Brookgreen projects and showed costs for labor, concrete, steel, lumber, other materials, subcontracts and other expenses, and was broken down between foundations and flatwork. The summary was identified as Plaintiff's Exhibit 24 and showed the total costs to Amarillo of building Brookwood and Brookgreen. Mrs. Cobb testified, and the summary showed, that the total cost to Amarillo to do the Brookwood and Brookgreen jobs was $249,562.17. This summary was offered and admitted in evidence.

From this testimony concerning Brookwood and Brookgreen, Amarillo proved: (1) The total contract price on both these contracts plus both change orders totalled $320,475.47; (2) Amarillo's total combined costs on these two jobs was $249,562.17 plus labor overhead of $6423.97; (3) Amarillo's

actual profit on Brookwood and Brookgreen combined was $64,489.33 or 20.12%. By applying this same percentage of profit (20.12%) actually realized on Brookwood and Brookgreen, to the Brookstone contract totalling $297,946.21, Mr. Guy Wells, president of Amarillo, testified that Amarillo's anticipated profit on the Brookstone contract would be $59,946.78.

■ In our opinion, the books and records of Amarillo as produced in court and identified by Mrs. Cobb as custodian thereof, would have been properly admissible into evidence as business records under Article 3737e, Vernon's Texas Civil Statutes, the Business Records Act. See *University Savings and Loan Assn. v. Security Lumber Co.* (Tex.1967) 423 S.W.2d 287; *Eubanks v. Winn* (Houston Tex.Civ.App.1971) 469 S.W.2d 292, NRE. In other words, the admissibility of these underlying records was established. Since these records were voluminous, were admissible, and were made available in court to Defendants for inspection and cross-examination, we believe a proper predicate was laid by Plaintiff-Appellee for the introduction of the summary (Plaintiff's Exhibit 24) into evidence, under the test laid down by our Supreme Court in *Black Lake Pipe Line Co. v. Union Construction Co.* (Tex.1976) 538 S.W.2d 80.

■ A summary of voluminous records may, in the discretion of the trial court, be admitted into evidence to expedite the trial and aid the trier of fact. This rule assumes that the underlying records, upon which the summary is based, are themselves admissible. *Black Lake*, supra; *Cooper Petroleum Co. v. La Gloria Oil and Gas Co.* (Tex.1969) 436 S.W.2d 889; *Texas Warehouse Co. of Dallas, Inc. v. Springs Mills, Inc.* (Waco, Tex.Civ.App. CA 1974) 511 S.W.2d 735, NRE; Wigmore on Evidence, 3rd Edition, 1940, sec. 1230.

Plaintiff-Appellee also introduced evidence as to costs of constructing the Brookstone project from the expert opinion testimony of Guy Wells, Amarillo's president. Mr. Wells was shown to have had considerable experience in the concrete construction

business, and testified to a substantial record of Amarillo under his leadership in building several large commercial projects for a profit. He testified that Amarillo could have performed the Brookstone contract in addition to performing all its other work, and that Amarillo had built numerous projects in Florida before it ever undertook the Deal contracts. Wells testified that he was personally familiar with all costs for labor, material, and other items in Clearwater, Florida during 1973 and 1974. He testified to the manner in which he makes proposals or bids on contracts. He made the initial cost estimate in 1973 for the Brookstone project, and then revised his estimate when the change order took effect for inserting the beams in the foundations. He testified that Amarillo's cost to do Brookstone in July of 1973 would have been $225,996.00; in December 1973 it would have been $236,002.00; in February 1974, the cost would not have increased; there would have been no increase in May 1974; but in July 1974 the cost would have been $237,502.00; in August 1974 there would have been no increase; but in September 1974, the cost would have been $239,002.00.

Mr. Wells then testified that had Amarillo been allowed to begin the Brookstone project in December of 1973, its profit would have been $61,944.16; whereas had Amarillo been able to begin Brookstone in July of 1974, the company would have earned a profit of $60,444.16. Then, as stated hereinabove, Mr. Wells testified that by applying the 20.12% profit formula as actually realized from Brookwood and Brookgreen, to the Brookstone job, that Amarillo would have realized a profit of $59,946.78 from the Brookstone contract. Mr. Wells was shown to be a qualified expert witness familiar with Amarillo's operations and familiar with costs to complete Amarillo's obligations under Brookstone's contract and change order.

In our opinion, the evidence to support the jury's finding of $248,126.96 in answer to Special Issue No. 11 as Amarillo's cost to complete Brookstone as of July 31, 1974, is ample, and both legally and factually sufficient.

■ Plaintiff-Appellee Amarillo by cross-point contends the trial court erred in overruling Plaintiff-Appellee's motion for prejudgment interest on its amount of damages from August 1, 1974 to the date of judgment, to wit, July 22, 1976. We sustain this contention, and hold that Plaintiff-Appellee is entitled to pre-judgment interest at 6% per annum on $32,854.25, the amount of the judgment, from August 1, 1974 until July 22, 1976, the date of judgment. Article 5069–1.03, Vernon's Texas Civil Statutes. Plaintiff-Appellee pleaded for pre-judgment interest.

■ Where damages are established as of a definite time and the amount thereof is definitely determinable, as in the case at bar, interest is recoverable as a matter of right from the date of injury or loss. *Watkins v. Junker* (1897) 90 Tex. 584, 40 S.W. 11; *Texas Co. v. State* (1955) 154 Tex. 494, 281 S.W.2d 83; *Comet Aluminum Co. v. Dibrell* (Tex.1970) 450 S.W.2d 56; *Black Lake Pipe Line Co. v. Union Construction Co.* (Tex.1976) 538 S.W.2d 80.

Here, the amount of damages to which Plaintiff-Appellee was entitled was definitely established as of July 31, 1974; therefore, Plaintiff-Appellee was entitled to pre-judgment interest from August 1, 1974, to the date of judgment.

■ Plaintiff-Appellee asserts seventeen cross-points complaining of the $16,965.00 counterclaim allowed by the trial court against Plaintiff-Appellee in the judgment, based upon the jury's findings in answer to Special Issue Numbers 16, 17, and 18. In answer to these issues, the jury found: (16) in July 1974, Defendant Deal was the owner of certain steel in the possession of Amarillo, for use in the Brookstone foundations; (17) in July 1974, Amarillo converted such steel to its own use on another project; and (18) the reasonable cash market value of said steel at the time and place in question was $16,965.00. We have carefully considered Plaintiff-Appellee's cross-points, and without discussing same in detail, overrule them as being without merit. Suffice

it to say that the evidence is legally and factually sufficient to support the jury's findings in answer to Special Issues Nos. 16, 17, and 18.

Defendant-Appellants have other points and contentions, all of which we have carefully considered. We overrule all of same as being without merit.

Judgment of the trial court is reformed by awarding Plaintiff-Appellee pre-judgment interest from August 1, 1974, to July 22, 1976, the date of judgment, and as reformed, said judgment is affirmed.

REFORMED AND AFFIRMED.