PARKS–DAVIS AUCTIONEERS, INC., et al., Appellants,

v.

T.O.K. COMPANY, INC., Appellee.

No. 5946.

Court of Civil Appeals of Texas, Waco.

Sept. 28, 1979.

Rehearing Denied Oct. 25, 1979.

Herbert N. Lackshin and Bernus William Fischman, Lackshin & Nathan, Houston, Roy W. Hill, Fairfield, for appellants.

Robert H. Smith and Jerry K. Sawyer, Sanders, Saunders, Brian, Finney & Thomas, Amarillo, for appellee.

HALL, Justice.

Plaintiff-appellee T.O.K., Inc., and defendant-appellant Parks-Davis Auctioneers, Inc., executed a written contract dated November 30, 1974, and an amendment thereto dated September 30, 1975, for the excavation, removal and reconditioning of approximately 1,360,000 feet of an old petroleum products pipeline running through nine counties in east and central Texas. The line was composed of eight-inch and ten-inch steel pipe, except for a very small portion (40,000 feet) of six-inch steel pipe. It was located in an easement owned by Gulf Refining Company. Although the pipe in question was not in use, other lines in the easement were in use. The pipeline was originally constructed in the early 1900's of 20-foot lengths of pipe joined together by threaded collars, a method of construction which is obsolete. Over the years of its use, sections of the pipeline in question had been replaced with lengths of pipe joined by welding, which is the present method of construction.

Parks-Davis and the other appellants (whom we shall later identify), acting together in a joint venture, purchased the pipe from Gulf with the intention of selling it for a profit after its removal and reconditioning. It is undisputed that Parks-Davis was acting for itself and the other appellants when it executed the contract and amendment in question.

The contract provided that T.O.K. would excavate the pipe and deliver it to storage yards located along the line; that Parks-Davis would "promptly thereafter" remove the pipe to its yard in the City of Houston; and that after the pipe was placed in the Houston yard, T.O.K. at its expense would clean, straighten, drift[1] and tally the pipe. Prior to delivery to Parks-Davis, it was T.O.K.'s duty to "cut the pipe in approximate 40-foot lengths, using the rough cut or torch cut method, and as near as possible to cut only at the welds and to strap[2] all pipe

---

1. The pipe was "drifted" by running a measuring device through it to be certain there were no inside dents or other obstructions which would prevent or interfere with the passage of a drill bit.

2. The pipe was "strapped" by marking it at the place it was to be cut.

and cut at a minimum of two inches behind the collar." T.O.K. also agreed to leave the pipeline right-of-way "in a clean, level and smooth condition," "repair all fences and roads," and "restore and leave the surface of the right-of-way in a condition acceptable to Parks-Davis, Gulf Refining Company, and the landowner."

The original contract provided that Parks-Davis would pay T.O.K. "the sum of 58¢ per foot for all pipe delivered to and accepted by Parks-Davis in compliance with the terms of this Agreement"; that T.O.K. would invoice Parks-Davis on or before the 5th day of each month "for all pipe delivered to and accepted by" Parks-Davis during the preceding month; and that Parks-Davis would make payment within ten days after receipt of the invoice. Under the terms of the amendment the parties agreed that by the 5th day of each month T.O.K. would bill Parks-Davis for work performed during the previous month "in accordance with the following schedule: a. 45¢ per foot for pipe removed from the ground and ready for delivery to the Houston yard, b. 13¢ per foot for pipe cleaned, straightened and drifted in the Houston yard"; and that Parks-Davis would pay the invoice by the 10th day of the month of billing. However, paragraph 17 of the contract provided that until the work was 75% completed Parks-Davis would retain 10% of the amount of each invoice; that upon completion of 75% of the work Parks-Davis would release one-half of the amount theretofore retained; that thereafter Parks-Davis would retain only 5% of each invoice; and within thirty days after receipt of an affidavit from T.O.K. "that all work has been completed under the terms of this agreement" Parks-Davis would pay T.O.K. the balance of the retained funds. Also, in paragraph 18 it was "specifically provided that if in the removal, delivery and reconditioning of said pipe any damage should occur to the pipe which is caused by T.O.K.'s acts of negligence, then Parks-Davis shall deduct from the payments otherwise due to T.O.K. an amount equal to 58¢ per lineal foot for each joint of damaged pipe." In paragraph 13, T.O.K. assumed the "entire responsibility"

for the payment of losses, expenses, damages and claims arising out of any injury or alleged injury to person or property caused by it, and it agreed to indemnify Parks-Davis and hold it harmless from any and all such losses, expenses, damages and claims. The above provisions of paragraphs 13, 17 and 18 were not changed in the amendment.

The original contract provided that T.O.K. would commence work thereunder not later than the week of November 25, 1974; and that it would complete the work not later than June 20, 1975. The amendment recited that T.O.K. and Parks-Davis mutually agreed to cease operations under the contract from April 15, 1975, through October 6, 1975; that they "have now agreed to commence again the removal and reclamation operations" set forth in the original agreement; and that Parks-Davis agreed to pay T.O.K. $4,000.00 "for the start-up costs incurred in connection with the resumption of operations." It was provided in paragraph 4 of the amendment that T.O.K. would commence operations "as soon as possible; however, it will not do so until Gulf Refining Company has provided an inspector to be on the job site at the commencement of and during the conduct of T.O.K.'s operations." Paragraphs 5 and 8 set forth these terms:

"5. T.O.K. agrees to remove any and all of the remaining pipe in the ground which was the subject of the original Pipeline Removal Agreement, including pipe which was skipped over and not taken up previously, except where weather conditions make the right-of-way impassable and such removal is impractical [and except pipe through the City of Lufkin which will be negotiated later by the parties].

"8. Except as amended herein, the Pipeline Removal Agreement, dated November 25, 1974, is in full force and effect, and such Agreement is hereby ratified, confirmed and approved by the parties. It is further understood and agreed that the parties have not waived and do not hereby waive any default by the oth-

er party in complying with the terms of said original Agreement."

The amendment did not set forth a new date for completion of the work under the contract.

This suit was filed by T.O.K. against Parks-Davis on April 15, 1976. T.O.K. pleaded the contract and the amendment, and alleged that until March 11, 1976, it had fully performed under the contract and was prepared to continue to perform until all work was completed, but that on that day it was forced to abandon and terminate any further work under the contract because Parks-Davis had materially breached the contract by failing and refusing to pay T.O.K. $32,591.58 for work performed during December, 1975, $6,361.10 for work performed during January, 1976, $43,496.98 for work performed in February, 1976, and $6,153.76 for work performed in March, 1976. T.O.K. prayed for recovery of those amounts, totaling $88,603.42. T.O.K. also alleged that Parks-Davis had retained $33,-980.12 from past invoices, and that by reason of Parks-Davis's breach of the contract T.O.K. was entitled to recover the retained funds, which, after demand, Parks-Davis refused to pay. Additionally, T.O.K. sought recovery of $3,714.70 as the reasonable value of extra work allegedly agreed upon by it and Parks-Davis, based upon an invoice for employees-overtime pay totaling $1,194.70, and an invoice for extra-depth ditch work totaling $2,520.00; and it sought recovery of consequential damages in the sum of $94,048.78 "representing the reasonable cost and expenses of machinery, equipment and labor," and certain interest expense on borrowed money, all allegedly incurred by reason of asserted delays and "downtime" of its equipment and employees caused by Parks-Davis's failure to meet its responsibilities under the contract, and the failure to pay T.O.K.'s invoices on time.

Parks-Davis answered T.O.K.'s suit with a general denial on May 24, 1976.

On January 12, 1977, Parks-Davis filed a third-party action against appellants H. Rosen Oil Company, Harvey Rosen individually, and Houston Pipe and Supply Company (hereinafter "Rosen defendants"), and alleged in effect that Parks-Davis executed the contract with T.O.K. on behalf of a joint venture known as P–D Pipe and Supply; that the Rosen defendants were the other members of the venture; that on March 26, 1976, the Rosen defendants purchased "all of Parks-Davis's right, title and interest" in the joint venture; that in connection with the purchase the Rosen defendants agreed in writing that they would indemnify Parks-Davis against any and all damages and claims including attorney's fees resulting from the venture, including those resulting from the contract with T.O.K. Parks-Davis prayed for judgment against the Rosen defendants for any recovery against it by T.O.K.

Thereafter, the Rosen defendants filed their original counterclaim against T.O.K. in which they pleaded the pipeline removal contract and its amendment between Parks-Davis and T.O.K., and alleged that Parks-Davis was acting for itself and also for them in the execution of those instruments. They then asserted that T.O.K. had deliberately refused to discharge its obligations under the contract, detailed numerous breaches allegedly committed by T.O.K., and sought damages for the breaches totaling $959,324.00. T.O.K. answered the counterclaim, and also filed its first amended original petition against the Rosen defendants and Parks-Davis in which it restated the claims set forth in its original petition. Eventually, the Rosen defendants filed their second amended answer containing a general denial and several special denials of T.O.K.'s suit, and their second amended counterclaim against T.O.K. The Rosen defendants specially denied the performance of work alleged by T.O.K. during the months of December, 1975, January, 1976, February, 1976, and March, 1976; specially denied that T.O.K. was entitled to recover the retained funds, and affirmatively alleged as grounds for continued retention of the funds that T.O.K. had not completed 75% of the work; specially denied T.O.K.'s pleadings for extra work, but admitted that it agreed to pay the cost of the extra-depth

ditch work totaling $2,520.00; and specially denied that they hampered and delayed T.O.K.'s operations under the contract, and denied that T.O.K. had been damaged in the amount of $94,048.78 by reason thereof. In the second amended counterclaim, the Rosen defendants again alleged numerous breaches of contract by T.O.K., and pleaded for damages therefor totaling $515,350.44. Among their claims for damages were allegations (1) that T.O.K. caused 52,122 feet of pipe to be broken or cut into 20-foot lengths instead of 40-foot lengths "as required by the Agreement," entitling the Rosen defendants under the contract to an amount equal to 58¢ per lineal foot of the damaged pipe totaling $30,230.00; and (2) that T.O.K. had failed to indemnify the Rosen defendants for losses, expenses, damages and claims paid by them for damages to property in the sum of $152,381.44, resulting from T.O.K.'s failure to leave the right-of-way in a clean, level and smooth condition, repair all fences and roads, remove all debris from the right-of-way, and restore the surface of the right-of-way to a condition acceptable to the Rosen defendants, Gulf Refining Company, and the landowners.

The case was tried to a jury in November, 1977. Prior to the trial, an interlocutory judgment was rendered awarding Parks-Davis judgment against the Rosen defendants jointly and severally for the amount of any judgment obtained by T.O.K. against Parks-Davis. This judgment was based upon the stipulation and motion of those parties growing out of the indemnity agreement between them. Also, during the course of the trial Parks-Davis and the Rosen defendants (hereinafter, collectively, "defendants") stipulated that they had retained funds from T.O.K.'s invoices in the sum of $33,980.12 (the amount pleaded by T.O.K.) which had not been paid to T.O.K.

It was undisputed on the trial that it was T.O.K.'s duty under the contract to deliver the pipe to the storage yards along the right-of-way and there load defendants' trucks for delivery to the Houston yard; that it was defendants' duty to promptly remove the pipe from the right-of-way yards to the Houston yard and there load it onto racks for immediate accessibility to T.O.K. for cleaning and straightening. The record also establishes that it was defendants' responsibility to deal with landowners along the right-of-way easement ahead of T.O.K.'s operation and thereby arrange to have the right-of-way open for T.O.K.'s entry for removal of the pipe, but that the payment of the landowners' claims and damages was T.O.K.'s responsibility under the contract. Additionally, T.O.K. asserted on the trial (1) that the time of resumption of removal of pipe after the cessation in April, 1975, was strictly within its discretion; and (2) that defendants had misrepresented the depth of certain parts of the pipeline prior to execution of the original contract, thereby causing T.O.K. extra removal expense. Defendants denied both of those contentions.

T.O.K.'s pleadings for extra work damages totaling $3,714.70 were based upon two invoices which were numbered PX14 and PX15 on the trial; and its pleadings for consequential damages totaling $94,048.78 allegedly resulting from "downtime" of equipment and employees and interest paid on borrowed money, all caused by defendants' delays, were based upon eight invoices which were exhibits PX16 through PX23 on the trial. The invoices were for the following items and amounts:

| Exhibit | Item | Amount |
|---------|------|--------|
| PX14 | Employees' overtime pay for Sunday work loading defendants' trucks at the right-of-way yards during January, February, and March, 1975. | $ 1,194.70 |
| PX15 | Extra-depth ditch work. | 2,520.00 |
| | TOTAL EXTRA WORK DAMAGES: | $ 3,714.70 |
| PX16 | Expenses for moving equipment, and waiting time wages, when portion of right-of-way not open. | $ 631.00 |

| Exhibit | Item | Amount |
|---|---|---|
| PX17 | Downtime expenses for rented equipment and its operating personnel when right-of-way not open. | 10,000.00 |
| PX18 | Interest paid by plaintiff on money borrowed by it for operating expenses because of late payments by defendants on invoices. | 1,552.78 |
| PX19 | Downtime wages at the Houston yard when pipe not racked by defendants. | 5,000.00 |
| PX20 | Downtime rental expense for pipe cleaning machine at Houston yard when pipe not racked by defendants. | 7,000.00 |
| PX21 | Downtime rental of a parking lot for equipment during cessation of work in summer of 1975. | 400.00 |
| PX22 | Downtime expenses for T.O.K.'s equipment and its employees' wages from August 4, 1975, to October 1, 1975. | 65,000.00 |
| PX23 | Downtime rental expense for miscellaneous equipment at the Houston yard from September 11, 1975, to October 1, 1975, when pipe not racked by defendants. | 4,465.00 |

TOTAL CONSEQUENTIAL DAMAGES: $94,048.78

The case was submitted to the jury on 37 special issues. The following answers by the jury are pertinent to the questions raised by the parties on this appeal:

Nos. 1, 2, 3, and 4: Found that prior to the execution of the original contract defendants misrepresented the depths of pipe to T.O.K., but failed to find that the misrepresentations were material to T.O.K.'s execution of the contract.

Nos. 14A and 15A: Found defendants failed to pay T.O.K. $32,591.58 "for work performed by T.O.K. during the month of December, 1975."

Nos. 14B and 15B: Found that defendants failed to pay T.O.K. $6,361.10 "for work performed by T.O.K. during the month of January, 1976."

Nos. 14C and 15C: Found that defendants failed to pay T.O.K. $43,496.93 "for work performed by T.O.K. during the month of February, 1976."

Nos. 14D and 15D: Found that defendants failed to pay T.O.K. $6,153.76 "for work performed by T.O.K. during the month of March, 1976."

No. 16: Found that defendants agreed to pay T.O.K. a reasonable sum for all extra work performed, and "reasonable interest for late payments."

No. 17: Found that defendants failed to pay T.O.K. for the extra work performed and reasonable interest for late payments.

No. 18: Found that $25,243.48 would reasonably compensate T.O.K. for the extra work and for reasonable interest.

Nos. 19A, 19B, 19C, 20A, 20B, and 20C: Found that defendants (19A) failed to provide T.O.K. "timely access to a portion of the right-of-way so that T.O.K. could remove some of the pipe in question," (19B) failed to "supply sufficient equipment to keep the racks loaded and unloaded at the Houston yard," and (19C) failed to "supply sufficient transportation of pipe from the pipeline to the Houston yard"; and (20A, 20B, and 20C) that T.O.K. "was damaged as a proximate result" of each of those failures.

No. 21: Answered "0" to the question asking what sum of money would reasonably compensate T.O.K. for the damages found in the answers to special issues 20A, 20B, and 20C.

No. 22: Failed to find that the decision regarding the time for resumption of the work following the mutual cessation of work in April, 1975, was to rest exclusively with T.O.K.

No. 26: Failed to find that T.O.K. "breached its obligations under the contract by failing to clean, straighten and drift pipe removed from the ground."

No. 28: Failed to find that T.O.K. "breached its obligations under the contract by failing to remove pipe from the ground in the months of January, 1976, February, 1976, and March, 1976."

No. 32: Found that the Rosen defendants "paid for losses, expenses, damages, demands and claims in connection with and arising out of injury to person or damages to property sustained in connection with or arising out of the removal of pipe."

No. 33: Found that $76,171.00 would "fairly and reasonably indemnify" the Rosen defendants for the damages and claims found to have been paid by them in the answer to special issue 32.

No. 34: Found that T.O.K. failed to cut 64,500 feet of pipe "into approximately 40-foot lengths."

No. 35: Found that the defendants are entitled to a credit of $14,965.02, as the result of T.O.K.'s "failure to cut pipe into lengths of approximately 40 feet."

No. 36: Made the following answers to the question asking whether defendants "agreed with T.O.K. to pay a reasonable sum for those matters and items made the subject of the following invoices submitted by T.O.K.":

A.  PX14?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do

B.  PX15?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

C.  PX16?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

D.  PX17?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

E.  PX18?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

F.  PX19?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

G.  PX20?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

H.  PX21?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do

I.  PX22?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

J.  PX23?
ANSWER:  "We do" or "We do not"
ANSWER:  We Do Not

No. 37: Failed to find that T.O.K. "waived the obligation" of defendants "under any such agreement [found in answer to special issue 36]."

T.O.K. filed a motion for judgment on the verdict in which it asked the court to either disregard the jury's answer to special issue 21 or, alternatively, to reconcile the jury's answers to special issues 16, 17, 18, 19, 20, and 36, by determining that the jury's award of $25,243.28 in the answer to special issue 18 (which inquired about damages for extra work and interest on late payments) was intended by the jurors to include and did include an award by them for damages allowed T.O.K. not only for extra work but also for the consequential damages found by the jury in answers to special issues 19 and 20. In support of the motion T.O.K. argued that although in answers to special issue 36 the jury found that defendants had not agreed to pay most of the items claimed by T.O.K. as consequential damages, such damages are not required to be based upon a separate agreement to pay if they resulted from breaches of defendants' duties under the contract; and that the only reasonable and logical explanation for the answer to special issue 18 must be that the jury included therein all damages they wished to award T.O.K. for both extra work and consequential damages flowing from defendants' failure to comply with their duties under the contract as found in the answers to special issues 19 and 20.

Defendants also filed a motion for judgment and for judgment notwithstanding the verdict in which they asserted among other contentions that the maximum amount T.O.K. may recover under special issue 18, the extra work and interest issue, is the sum of $3,714.70 pleaded for and proved (PX14 and PX15) by T.O.K. for extra work, plus $1,552.78 for interest (PX18), and that the court should therefore disallow the amount of the jury's award of $25,243.48 in excess of $5,267.48.

The court granted T.O.K.'s motion. Judgment was rendered granting T.O.K. a recovery of $67,307.91 against defendants. The interlocutory judgment was also finalized in favor of Parks-Davis against the Rosen defendants for $67,307.91.

The court's computation of the $67,307.91 awarded T.O.K. is not shown in the record. In their briefs, the parties say the judgment was calculated in this manner: T.O.K. was allowed $88,603.37 under the jury's answers to special issues 14 and 15; prejudgment interest in the sum of $10,616.96 on the individual invoices upon which the $88,603.37 allowance was based; the funds retained by defendants from T.O.K.'s billings in the sum of $33,980.12; and $25,243.48 under the answers to special issues 16 through 21. T.O.K.'s total allowance was $158,443.93. Parks-Davis and the Rosen defendants were allowed $76,171.00 under the answers to special issues 32 and 33; and $14,965.02 under the answers to special issues 34 and 35. Their total allowance was $91,136.02. T.O.K. was granted recovery of the $67,307.91 difference.

█ Defendants contend that the jury's answers to special issues 26 and 27 (failing to find that T.O.K. breached the contract by failing to recondition pipe in the Houston yard and by failing to remove pipe from the ground during the months of January, February, and March, 1976) are against the great weight and preponderance of the evidence. We overrule those contentions. It is undisputed in the record that T.O.K. did not remove all of the pipeline and that it had not reconditioned all of the pipe it had removed when it ceased all operations in March, 1976. The controlling question tried by the parties was whether T.O.K.'s abandonment of the work was caused or not by defendants' breaching the contract by failing to pay T.O.K.'s invoices for December, 1975, and January, February, and March, 1976. The jury resolved the question in favor of T.O.K. in the answers to special issues 14, 26, and 27.

T.O.K. began work under the contract in late November, 1974. In April, 1975, because of heavy rains and floods producing difficult working conditions and resulting in extraordinary damage to the right-of-way by the pipe removal equipment, the parties agreed to cessation of the pipeline removal from the ground. T.O.K. resumed excavating the pipe about October 1, 1975, after the amendatory contract was executed. From April until October, T.O.K. continued reconditioning the pipe at the Houston yard. T.O.K. excavated the pipe in October, November, and December, 1975, but it did not in January, February, and March, 1976. However, it did continue with the pipe reconditioning during all of those months until it abandoned the project on March 11, 1976. After T.O.K. left the job, the defendant employed other contractors to finish the excavation and the reconditioning of the pipe, including the reconditioning of pipe removed from the ground by T.O.K.

In summary, T.O.K.'s primary contentions were that it abandoned the project and was justified in doing so because defendants failed to pay its invoices, and that it was prepared and ready to continue with the contract if the invoices had been paid. Defendants asserted that they were justified in withholding the payments because T.O.K. quit removing pipe from the ground after December, 1975, when only the easiest part of the excavation had been completed, and after T.O.K. had threatened taking bankruptcy in November and December, and because of other problems involving the asserted lack of needed equipment by T.O.K. to finish the job. The jury resolved that dispute in favor of T.O.K., and in the light of all of the proof we hold the jury's answers to special issues 26 and 27 are not

against the great weight and preponderance of the evidence.

■ Defendants contend that the court erred in allowing T.O.K. recovery of the jury's award of $25,243.48 (in the answer to special issue 18) for extra work and interest because T.O.K. pleaded for only $3,714.70 for extra work and because there was no agreement by the defendants that they would pay for extra work performed by T.O.K. or expenses incurred by it. Those contentions are overruled.

In answers to special issues 19 and 20, the jury found that T.O.K. suffered consequential damages by reason of the defendants' breach of certain duties assumed by them under the contract. It is clear from the verdict that the jury's award of $25,243.48 in answer to special issue 18 includes awards for some of the consequential damages sought by T.O.K.; and, contrary to defendants' contentions, we hold the trial court properly reconciled the verdict to that effect on T.O.K.'s motion for judgment. It is also evident that in making the award the jury allowed T.O.K. the amounts reflected by PX14, PX16, PX17, PX18, PX20, PX21, and PX23, which total exactly $25,243.48.

■ T.O.K. was entitled to just compensation for loss or damage actually sustained by it resulting from breaches of contractual duties by defendants. *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 487 (1952). Defendants do not question the measures used by T.O.K. for calculating its consequential damages, and that issue is not before us. T.O.K. was also entitled to recover in *quantum meruit* upon an agreement implied by law for the reasonable value of services rendered and accepted by defendants which were not covered by the contract. *Black Lake Pipe Line Co. v. Union Const. Co.*, (Tex.1976) 538 S.W.2d 80, 86.

■ It was defendants' duty under the contract to promptly remove the excavated pipe from the storage yards along the right-of-way to the Houston yard; and it was T.O.K.'s responsibility to load the pipe onto defendants' trucks at the storage yards.

There is evidence that because defendants failed to furnish trucks on a regular schedule, some overtime loading on Sundays resulted, and T.O.K. also suffered some crew downtime for want of trucks to load. PX14 represents T.O.K.'s claim for only the overtime for crews and equipment. Defendants received the benefit of that extra work. Also, in answer to special issue 36, the jury found that defendants agreed to pay for the loading overtime, and also agreed to pay for the equipment lot rental for $400.00 during the summer of 1975, reflected by PX21. Defendants' contention that the evidence is factually insufficient to support those findings is overruled. The remaining damages allowed by the jury in the answer to special issue 18 resulted from defendants' breach of their duties under the contract, and were therefore properly recoverable by T.O.K.

We notice that although the Rosen defendants admitted in their pleadings that T.O.K. was entitled to recover the $2,520.00 shown on PX15 for extra-depth ditch work, Parks-Davis did not join in the admission. The submission of the issue to the jury failed to result in a finding favorable to T.O.K. The court's failure to allow T.O.K. recovery against the Rosen defendants on this admitted item likely resulted from the jury's answer thereon against T.O.K. and also the jury's failure to find, in answer to special issue 4, that defendants' misrepresentation of the depth of the pipe was material to the execution of the contract. In any event, T.O.K. does not complain because it was not allowed this recovery; and defendants may not complain about it.

Under the contract, it was defendants' duty to contact the landowners along the right-of-way in front of T.O.K.'s crews, and have the right-of-way open for T.O.K.'s excavation of the pipe; but T.O.K. assumed responsibility in paragraph 7 for restoring the right-of-way to an acceptable condition, and in paragraph 13 it assumed the "entire responsibility" for and agreed to indemnify defendants against "all losses, expenses, damages and claims" caused by it to the landowners' property. The procedure agreed to and used by the parties for deal-

ing with the landowners was this: Defendants employed a company known as Coates Field Service to make the advance contact with the landowners, and they also used their own employee, Steven Rosen, for that purpose. The landowner was contacted, arrangements were made for T.O.K. to come through the property, and in most instances settlement was made with the landowner after T.O.K. had completed removing the pipe and had restored the right-of-way.

The Rosen defendants pleaded for recovery of $152,381.44 allegedly paid by them to landowners for property damages and expenses in connection therewith. Their proof showed they paid $152,343.44. In the answers to special issues 32 and 33, the jury found that the Rosen defendants had made expenditures in connection with property damages, but found that $76,171.00 would "fairly and reasonably indemnify" them. Defendants assert that the evidence conclusively establishes that they paid $152,343.44 for property damages and expenses, and that the court erred in overruling their motion for judgment for that sum notwithstanding the jury's answer to special issue 33. We disagree. The proof on that element of the Rosen defendants' counterclaim was PX15, which, according to defendant Harvey Rosen, was a summary prepared by him of checks representing (1) payments from Coates Field Service to landowners, (2) periodic payments from defendants to Coates Field Service reimbursing Coates for the payments made by it to the landowners and also paying Coates for its services, and (3) payments by defendants' employee Steven Rosen to the landowners. The pages dealing with payments to landowners contained columns listing the landowners' names, the date of each check to them, the amount of the check, the number of the check, the name of the agent who made the payment, and a remarks column showing what the check was for. The summary showed that Coates's agent paid 442 landowners in individual amounts ranging from $1.00 to $3,300.00, totaling $121,202.09; and it showed that defendants' agent paid 119 landowners in individual amounts ranging from $5.00 to $1,000.00, totaling $21,718.56.

A separate page of the summary listed defendants' reimbursement checks to Coates, which also included in their total $9,392.79 paid to Coates for its services. Defendants' witness stated that he had with him in the courtroom "all of the cancelled checks, all of the executed releases from the landowners, and all of the invoices submitted [to him] by Coates Field Service representing payments by them in connection with this matter."

T.O.K. did not object to defendants' offer of the summary into the evidence.

■ The transactions between Coates Field Service and the landowners, between Steven Rosen and the landowners, and between defendants and Coates Field Service, and the records resulting from those transactions which formed the underlying records for the summary PX15, were all hearsay to T.O.K. "Hearsay evidence is no evidence at all. Whether admitted over or without objection, it is incompetent and without probative force." *Knapik v. Edison Bros., Inc.*, 313 S.W.2d 335, 337 (Tex.Civ. App.—Waco 1958, writ ref.). "Such incompetent evidence can never form the basis of a finding of fact or of the judgment of a court; and this is so whether it be objected to or not." *Texas Co. v. Lee*, 138 Tex. 167, 157 S.W.2d 628, 631 (1941). A summary of voluminous records is no more admissible than the underlying records; and in order to overcome the hearsay nature of the underlying records, a proper predicate must be laid for their admission as business records in accordance with Article 3737e, Vernon's Tex.Civ.St. *Black Lake Pipe Line Co. v. Union Const. Co.* (Tex.1976) 538 S.W.2d 80, 92. In our case, defendants did not attempt to establish the predicate for the admissibility of the records underlying their summary PX15. The summary was hearsay evidence. The court properly overruled the motion for judgment based upon it. T.O.K. does not complain about the $76,171.00 recovery allowed the Rosen defendants on the jury's answer to special issue 33.

■ The Rosen defendants pleaded in their counterclaim that T.O.K. "cut or broke

52,122 feet of removed pipe into approximately 20 foot lengths contrary to the Agreement which specifically provides for all pipe to be cut into 40 feet lengths," and that "by reason of the breach" they were entitled to deduct from payments otherwise due to T.O.K. "an amount equal to $.58 per lineal foot for each foot of damaged pipe totalling $30,230.00." Those pleadings were based upon paragraphs 6 and 18 of the pipeline removal contract which read as follows:

"6. T.O.K. agrees that it shall perform all work so as to avoid the creation of dents both inside and outside of said pipeline. It agrees that prior to delivery to Parks-Davis, it shall cut the pipe in approximate 40-foot lengths, using the rough cut or torch cut method, and as near as possible to cut only at the welds and to strap all pipe and cut at a minimum of two inches behind the collar.

"18. It is specifically provided that if in the removal, delivery and reconditioning of said pipe any damage should occur to the pipe which is caused by T.O.K.'s acts or negligence, then Parks-Davis shall deduct from the payments otherwise due to T.O.K. an amount equal to 58¢ per lineal foot for each joint of damaged pipe."

T.O.K. answered defendants' claim by alleging that "all pipe removed by it was cut into lengths of approximately 40 feet," and that the cuts "were made as near as possible only at the welds and such cuts were made at a minimum of 2″ behind the collar, as required by the contract. Where such pipeline was cut into lengths less than 40 feet, it was only because the contract in question required that such cut be made only at the welds and at a minimum of 2″ behind the collar." The question of the "short pipe" credit pleaded for by the Rosen defendants was submitted to the jury in special issues 34 and 35. In the answer to special issue 34 the jury found that T.O.K. "failed to cut 64,500 feet of pipe into approximately 40 foot lengths"; and in the answer to special issue 35 the jury found that "the Defendants are entitled to $14,-965.02 as a credit as a result of T.O.K.'s

failure to cut pipe into lengths of approximately 40 feet." The Rosen defendants assert that the evidence shows conclusively that there were 64,504.4 feet of pipe cut into lengths shorter than 30 feet, and that as a matter of law under the terms of the contract they were entitled to a credit of 58¢ per foot for the short pipe (which totals $37,412.55) against whatever recovery the court allowed T.O.K., rather than a credit for only $14,965.02 found by the jury. We overrule those contentions.

The short pipe in question was composed of only eight-inch and ten-inch pipe. The evidence shows that defendants paid Gulf 69¢ per foot for the eight-inch pipe and $1.14 per foot for the ten-inch pipe. It is undisputed that T.O.K. and the defendants knew and expected when they executed both the original and amendatory contracts that proper removal of the pipe by T.O.K. in a workmanlike manner would result in the cutting of varying lengths of short pipe which would not approximate forty feet. Nevertheless, the short pipe was transported to the Houston yard and reconditioned there by T.O.K. along with the other pipe, and defendants paid T.O.K. 58¢ per foot for its removal and reconditioning, except for that set forth in the invoices which have not been paid by defendants. Defendant Harvey Rosen testified that after the project started the parties agreed that T.O.K.'s invoices would include the work done on the short pipe "so there would be working capital," that the short pipe would be placed in a separate stack as it accumulated, and that "we paid [the invoices] with the understanding that we would adjust" the payments after the project was completed.

Using tally sheets made and kept jointly by the parties, defendant Harvey Rosen testified without objection that there were 64,504.4 feet of pipe cut into lengths shorter than 30 feet by T.O.K. However, at another time when he was discussing the percentage of the project defendants contended T.O.K. had completed, he said the short pipe under 30 feet totaled 63,000 feet. Also, discrepancies in the total footage of the short pipe was raised in Rosen's testimony

as to the amount of short pipe sold as scrap. Without setting forth all of the proof, we hold it does not conclusively establish the figure 64,504.4 sought by defendants.

Rosen said the pipe weighed 28.55 pounds per lineal foot, and that it sold as scrap for $50.00 per ton. He testified to facts from which the jury could have determined that defendants received an amount between $30,935.66 and $46,036.87 for the short pipe sold as scrap, and that they sold some (varying from 500 or 600 feet to 5,000 or 6,000 feet in his testimony) to be used in the construction of culverts. The price received for the culvert pipe is not shown in the record. The tally sheets on the short pipe showed 6,195 feet of ten-inch pipe. The remaining 58,305 feet (64,500 less 6,195) was eight-inch pipe. The cost to defendants for this pipe would have been $47,292.75 (6,195 feet × $1.14, plus 58,305 × $0.69). Apparently, the jury determined the amount they believed defendants received for pipe sold as scrap and allowed defendants the difference between that amount and the cost of the pipe in their answer to the question "what amount of money, if any, are the Defendants entitled to as a credit as a result of T.O.K. Co., Inc.'s failure to cut pipe into lengths of approximately 40 feet?" submitted to them in special issue 35.

Defendants do not argue that the jury's allowance of $14,965.02 is not a fair and reasonable reflection of defendants' actual loss resulting from short pipe. Rather, they contend that the contract expresses the intention of the parties to treat the short pipe in question as "damaged pipe" within the meaning of paragraph 18, entitling defendants to a credit of 58¢ per foot. T.O.K. disputes that contention.

The following provisions of the contract are also pertinent to the question:

"1. T.O.K. shall remove and recondition all of the pipeline.

"14. T.O.K. shall complete its work in a good and workmanlike manner and shall use the best practice in pipeline removal and reclamation. It shall perform all work so as to deliver said pipe in a completely straight condition, free of dents with collars aligned. . . . T.O.K. further agrees that it shall remove teeth from its back-hoes wherever the equipment might strike the pipe so as to preclude the possibility of such teeth creating a dent in the pipe.

"17. Parks-Davis agrees to pay T.O.K. the sum of 58¢ per foot for all pipe delivered to and accepted by Parks-Davis in compliance with the terms of this Agreement.

"19. All pipe, equipment or other material and damage thereto shall be at the sole risk of loss or damage of T.O.K. until the pipe has been delivered to and racked in Parks-Davis's yard."

The contract was prepared by defendants. Although its language does not directly state that short pipe would or would not be "damaged pipe" within the meaning of paragraph 18, none of the parties claim the agreement is ambiguous. Obviously, the trial court construed the contract favorably to T.O.K.'s contentions. In the light of all of the provisions dealing with payments to T.O.K. and the question of damaged pipe and deductions from payments by defendants based on damaged pipe, and considering the subsequent agreement between the parties for handling the problem of payment for short pipe work by T.O.K., we agree with that construction.

Defendants have other points and contentions, including a complaint about the award of the retained funds to T.O.K.; and in a cross point T.O.K. asserts that Parks-Davis was erroneously allowed the benefit of the damages awarded under the counterclaim pleaded by the Rosen defendants. All of those contentions are without merit under the record, and they are overruled.

The judgment is affirmed.