ARTHUR ANDERSEN & CO., Appellant
and Cross–Appellee,

v.

PERRY EQUIPMENT CORPORATION,
Appellee and Cross–Appellant.

No. 01–93–01104–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 16, 1995.

Ben Taylor, Dallas, Tom Godbold, Houston, for appellant.

Christopher B. Allen, Michael P. Cash, James W. Paulsen, Houston, for appellee.

Before MIRABAL, WILSON and DUGGAN *, JJ.

## OPINION

MIRABAL, Justice.

This is an appeal from a judgment on a jury verdict in a malpractice, fraud, and deceptive trade practices case. The jury awarded the plaintiff, Perry Equipment Corporation (PECO), $9,297,601 against the de-

---

* Justice Duggan, who retired on December 31, 1994, continues to sit by assignment for the dis-position of this case.

fendant, Arthur Andersen & Co. (Arthur Andersen). The parties perfected separate appeals, which are considered together. We affirm.

It is uncontested that on August 23, 1985, PECO purchased Maloney Pipeline Systems, Inc. (Maloney Pipeline) from Ramteck II, Inc. (Ramteck II), for $4,088,237.[1] The acquisition was accomplished through a stock purchase. As a condition of the sale, Maloney Pipeline paid for Arthur Andersen to audit Maloney Pipeline for the benefit of PECO.

In early 1985, Arthur Andersen had been performing a consolidated audit on Ramteck Systems, Ramteck II, and Maloney Pipeline, but had stopped in June because of a question relative to the development of a mud machine by Ramteck II. On July 2, 1985, Mr. Vera and Mr. Russett of Arthur Andersen attended a meeting with Mr. Hartmann and Mr. Miller from Ramteck II to discuss the status of the audit and the possibility of the sale of Maloney Pipeline to PECO. At the end of July, Mr. Miller called Arthur Andersen and requested that it do a separate audit of Maloney Pipeline. Mr. Vera, the top Arthur Andersen employee on the Maloney Pipeline audit, testified he knew it was a condition of the Maloney Pipeline purchase and sale agreement that Arthur Andersen's audit be provided to PECO, and that it would not surprise him that people who receive Arthur Andersen's audits rely on them.

On May 20, 1985, approximately three months before PECO purchased Maloney Pipeline, an employee of Arthur Andersen sent Ramteck II's chief executive officer a letter, along with an enclosed report discussing the tax aspects of the proposed sale of Maloney Pipeline to PECO. In the report, Arthur Andersen stated that Maloney Pipeline was currently operating at a loss, and estimated the amount of that loss to be $600,-000. Mr. Perry, chief executive officer of PECO, testified that if he had seen the report prior to the date of the sale, PECO would not have purchased Maloney Pipeline.

Shortly before the purchase, PECO reviewed two financial statements prepared by Arthur Andersen. The March 31, 1985, statement was an audited one and covered the preceding 11–month period. The June 30, 1985, statement was not audited and covered the period subsequent to March 31, 1985. Both financial statements showed Maloney Pipeline to be a profitable company.

In November 1985, three months after the purchase, Maloney Pipeline, which PECO operated as a "stand-alone" company, ran out of money and required a cash infusion from PECO of $400,000. On March 23, 1986, PECO and Ramteck II entered into a settlement agreement whereby Ramteck II cancelled the purchase money promissory notes made by PECO totalling $2,000,000, and cancelled the letters of credit securing the notes. Maloney Pipeline continued to require cash infusions, and in October 1986, Maloney Pipeline filed Chapter 11[2] bankruptcy proceedings. The Chapter 11 reorganization was converted to a chapter seven[3] liquidation in 1989. Maloney Pipeline was still in chapter seven at the time of trial.

On February 12, 1987, PECO sued Arthur Andersen contending that the financial statements prepared by Arthur Andersen overstated the profits and net worth of Maloney Pipeline by millions of dollars. PECO alleged causes of action for negligence, negligent misrepresentation, gross negligence, fraud, breach of implied warranty, and violations of the Deceptive Trade Practices Act (DTPA).[4]

Questions were submitted to the jury on all causes of action. The jury found Arthur Andersen 51 percent negligent and PECO 49 percent negligent. It also found that Arthur

---

1. The purchase price was composed, in part, of promissory notes.

2. 11 U.S.C.S. §§ 1101–1174 (Law Coop.1987 and Supp.1994).

3. 11 U.S.C.S. §§ 701–766 (Law Coop.1987 and Supp.1994).

4. Tex.Bus. & Com.Code Ann. § 17.41 et seq. (Vernon 1987).

Andersen (1) committed fraud, (2) violated the DTPA, but not knowingly, and (3) breached a warranty. The jury responded negatively to the questions on gross negligence and negligent misrepresentation.

The jury found the following damages in connection with the DTPA cause of action:

| | | |
|---|---|---|
| a. | Purchase Price of Maloney Pipeline | $4,088,237 |
| b. | Costs and expenses incurred by PECO as a result of its purchase and ownership of Maloney Pipeline (totalled) | $1,361,231 [5] |
| | Total | $5,449,468 |

In its motion for judgment, PECO asked for judgment under the DTPA because it was the most favorable theory of recovery under the jury's verdict. The trial court awarded PECO damages under the DTPA as follows:

| | | |
|---|---|---|
| A. | Actual Damages | |
| | DTPA Actual Damages | $5,449,468 |
| | LESS Credit for Settlement with Ramteck II | ($2,000,000) |
| | TOTAL ACTUAL DAMAGES | $3,449,468. |
| B. | Prejudgment Interest on Net Actual Damages to 8/20/93 (10% compounded daily commencing 180 days following occurrence giving rise to cause of action [2,739 days]) | $3,856,972 |
| C. | DTPA Additional Damages | 1,000 |
| | SUB TOTAL | $7,307,440 |
| D. | Attorney's Fees (27% of $7,307,-440) | $1,973,009 |
| E. | Costs of Court expended by PECO (including mediation fee and special master fee) | $ 17,152 |
| | ***TOTAL AWARD TO PLAINTIFF*** | $9,297,601 |

In its fourth point of error, Arthur Andersen asserts the trial court erred in ruling that PECO was a "consumer" of Arthur Andersen's audit services under the DTPA.

■ Whether a party is a consumer is generally a question of law for the trial court. *Holland Mortgage & Inv. Corp. v. Bone*, 751 S.W.2d 515, 517 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). The DTPA defines a consumer as "an individual ... who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). To have a

valid complaint under the DTPA, the goods or services purchased or leased must form the basis of the complaint. *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351–52 (Tex.1987); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981).

■ That *PECO sought and acquired* the auditing services of Arthur Andersen is shown by the following uncontroverted facts:

(1) As a *condition of the purchase and sale* of Maloney Pipeline, PECO was to receive Maloney Pipeline's audited financial statements prepared by Arthur Andersen.

(2) Arthur Andersen performed a *separate audit* of Maloney Pipeline for the specific purpose of supplying audited financial statements *to PECO*.

(3) Arthur Andersen knew and expected that PECO would be relying upon the audited financial statements in making decisions regarding the purchase of Maloney Pipeline.

Further, it is clear from the pleadings that Arthur Andersen's auditing services "form the basis of" PECO's complaint. Thus, the only question remaining regarding PECO's consumer status relates to the "purchase" element of the consumer definition.

The record shows that although PECO "sought and acquired" Arthur Andersen's auditing services, it did not, itself, "pay" Arthur Andersen directly for those services. However, it is uncontroverted that Maloney Pipeline paid for the auditing services of Arthur Andersen *for the benefit of PECO*. This is sufficient. *See Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex.1985) (court held employee was a "consumer" under the DTPA even though he did not pay directly for a group health insurance policy where his employer purchased the policy "for his benefit"); *see also Rudolph v. ABC Pest Control, Inc.*, 763 S.W.2d 930, 933–34 (Tex.App.—San Antonio 1989, writ denied) (even though seller paid for services of termite inspector, purchaser

---

**5.** This is the total of nine items of damages awarded by the jury.

of home could pursue cause of action under DTPA, as well as under third-party beneficiary contract law, against pest control company who provided purchaser with allegedly false termite inspection report).

We hold that the trial court did not err in concluding, as a matter of law, that PECO was a "consumer" under the DTPA. Accordingly, we overrule Arthur Andersen's fourth point of error.

In its first point of error, Arthur Andersen asserts PECO failed to prove, and failed to obtain a jury finding of actual, recoverable damages under a correct legal measure. Arthur Andersen argues that PECO had to prove actual damages under the "out-of-pocket" or "benefit-of-the-bargain" measure, and because it failed to do so, the "purchase price" finding of $4,088,237 was immaterial and should have been disregarded.

■ The DTPA provides that a prevailing consumer may obtain "the amount of actual damages found by the trier of fact." TEX. BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.1994). The amount of actual damage recoverable under the DTPA is "the *total loss* sustained [by the consumer] as a result of the deceptive trade practice." *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex.1992); *Kish v. Van Note*, 692 S.W.2d 463, 466 (Tex.1985) (emphasis added). While the DTPA does not define "actual damages," the term has been construed to mean common-law damages. *W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex. 1988); *Kish*, 692 S.W.2d at 466.

■ The Texas Supreme Court has stated that under common law there are two measures of damages for misrepresentation: (1) the out-of-pocket measure, which is the difference between the value of that which was parted with and the value of that which was received; and (2) the benefit-of-the-bargain measure, which is the difference between the value as represented and the value actually received. *W.O. Bankston Nissan*, 754

S.W.2d at 128. However, the "benefit-of-the-bargain" and "out-of-pocket" measures are not exclusive. *Henry S. Miller*, 836 S.W.2d at 162. Other damages have been permitted to ensure the plaintiff is made whole. *Id.* (naming cost of removing defective product, lost profits, interest on indebtedness, loss of credit, and loss for improvements made).

In *Henry S. Miller*, the plaintiff sued under the DTPA, alleging that misrepresentations of the defendant induced the plaintiff to lease space in a shopping center for his beauty shop. *Henry S. Miller*, 836 S.W.2d at 161. The plaintiff recovered as actual damages the total amount of his capital investment in the lease venture *over a 21–month period*, **minus** the amount he had received back from the venture, including $23,000 he received when he sold his beauty shop business. *Miller v. Bynum*, 797 S.W.2d 51, 54 (Tex.App.—Houston [1st Dist.] 1990), *aff'd*, 836 S.W.2d 160, 163 (Tex.1992). The Supreme Court held that the evidence supported the award of these damages as part of the "actual loss" the plaintiff sustained, even though the plaintiff did not present evidence to support an "out-of-pocket" or "benefit-of-the-bargain" measure of damages. *Henry S. Miller*, 836 S.W.2d at 163.

Similarly, in the present case, it was established that Arthur Andersen engaged in deceptive acts (misrepresentations and failure to disclose material information) that were a producing cause of damages to PECO.[6] It is uncontroverted that in August 1985, PECO purchased Maloney Pipeline for $4,088,237. It is also uncontroverted that within four months of the purchase, PECO had to infuse $400,000 into Maloney Pipeline. Maloney Pipeline continued to require cash infusions, and in October 1986, about one year after PECO's purchase of the company, Maloney Pipeline was put into Chapter 11 bankruptcy proceedings. Maloney Pipeline continued to operate under the Chapter 11 reorganization protection until the Chapter 11 was converted to a chapter seven liquidation. Mr. Perry, chairman and CEO of PECO, testified that

6. The jury so found, and Arthur Anderson does not attack this jury finding on appeal.

the purchase price paid for Maloney Pipeline was a total loss that was written off; there was no evidence to the contrary.[7]

■ The only challenge to the damage award made by Arthur Andersen is to the inclusion of the purchase price of Maloney Pipeline as an element of damages. The question before us is whether the uncontroverted evidence established that PECO suffered a loss of the full amount of the purchase price, and did not retain any profits or other benefits to offset the loss.[8] Our conclusion is yes. Accordingly, in light of *Miller v. Bynum*, which recognized it is appropriate to award damages for the "total loss" sustained by the consumer as a result of a deceptive trade practice, and not just the "time of purchase" damages, we hold that the DTPA damage jury question was properly submitted and answered.[9]

We overrule point of error one.

In its second point of error, Arthur Andersen asserts that PECO was not entitled to recover daily compounded prejudgment interest.

The trial court awarded PECO prejudgment interest of 10 percent per annum, compounded daily, for 2,739 days, starting 180 days after August 23, 1985, the date of sale, and ending August 20, 1993, the date the judgment was signed. The trial court calculated the prejudgment interest on the actual damages found by the jury ($5,449,468) after it subtracted the amount of PECO's $2,000,000 settlement with Ramteck II.

Arthur Andersen argues that (1) PECO waived any right to recover prejudgment interest by failing to establish an accrual date; (2) no equities support the award of daily compounded *Cavnar*[10] interest and the award was an abuse of discretion; and (3) the six percent statutory rate should apply to most, if not all, of PECO's purported actual damages.

■ A plaintiff who recovers under the DTPA may be awarded prejudgment interest, assuming it pleads for such interest as PECO did here. *See Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 137 (Tex.1988); *Prudential Ins. Co. v. Jefferson*

---

7. There was conflicting evidence about the net value of Maloney Pipeline *as of the date of purchase*, August 1985. However, the evidence established that by the time of trial, Maloney Pipeline had been a "sink hole" and had a negative value. Arthur Andersen does not challenge the jury's findings that PECO suffered the following additional losses, separate and apart from the purchase price, as a result of Arthur Andersen's deceptive conduct:

| Costs and Expenses Incurred by PECO as a Result of its Purchase and Ownership of Maloney Pipeline: | |
| --- | --- |
| —Cash advances: | $ 420,000 |
| —Settlement with unsecured creditors of Maloney Pipeline: | $ 337,500 |
| —Plant relocation expenses: | $ 10,319 |
| —Storage fees for records and equipment: | $ 30,380 |
| —Cost to arrange new bank relations: | $ 80,578 |
| —Bid and performance bond costs: | $ 5,400 |
| —Cost related to Maloney Pipeline's bankruptcy proceedings: | $ 20,450 |
| —Cost management time and expenses not covered by contractual management fees: | $ 441,804 |
| —Time and expenses related to suit versus official unsecured creditors committee: | $ 14,800 |
| **TOTAL** | $1,361,231 |

The parties characterize these as "sink hole" damages, about which there is no dispute on appeal.

8. We note that the parties agree that a portion of the purchase price was "forgiven" through settlement with the seller of the stock, and the amount of the settlement was credited against the jury finding on damages. The parties agreed in the trial court to not confuse the issues by bringing up the settlement before the jury.

9. The submitted jury question could be construed as inquiring only about "consequential" damages, rather than about "direct" damages that are usually shown by the out-of-pocket or benefit-of-the-bargain measures of damages. *See Miller v. Bynum*, 836 S.W.2d at 163 (Phillips, C.J., concurring). Under the evidence in the present case, the submission was appropriate.

10. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex.1985).

*Assoc., Ltd.,* 839 S.W.2d 866, 879 (Tex.App.—Austin 1992, writ requested); *American Baler Co. v. SRS Sys., Inc.,* 748 S.W.2d 243, 250 (Tex.App.—Houston [1st Dist.] 1988, writ denied).

Arthur Andersen argues that under *Cavnar,* the trial court could award prejudgment interest to PECO only for the period between the *accrual of the claim* and the date of judgment. According to Arthur Andersen, to recover any prejudgment interest, PECO had to establish by jury findings, and failed to do so, (1) a definite amount of damages that (2) accrued at a definite date before trial. Arthur Andersen cites in support, *Black Lake Pipe Line Co. v. Union Constr. Co.,* 538 S.W.2d 80 (Tex.1976); and *Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147 (Tex.App.—Houston [1st Dist.] 1991, writ denied).

The issue in *Black Lake Pipe Line* was whether a prayer for "interest" without more, constituted sufficient pleading to support an award of prejudgment interest. 538 S.W.2d at 96. If the awards were upheld and the pleadings were sufficient to support prejudgment interest, the date interest began to accumulate was undisputed. *Id.* at 95. The supreme court found the pleadings to be sufficient and, because it was reversing and remanding some of the damage claims, it also reversed and remanded the corresponding prejudgment interest awards. *Id.* at 96. We find *Black Lake Pipe Line* to be inapplicable to the case before us.

In *Winograd,* the jury was asked, "What sum of money, if paid now in cash, would fairly and reasonably compensate the plaintiff for his damages?" We held that the jury's answer fixed the amount of damages as of the date of its verdict, not the date of breach. *Id.* at 157. Accordingly, we found Winograd was not entitled to prejudgment interest. *Id.*

■ As in *Winograd,* damage question number 15 to the jury here asked:

What sum of money, if any, if paid now in cash, would fairly and reasonably compen-

sate PECO for its losses which resulted from such conduct [violations of the DTPA, as asked in questions 12, 13, and 14]?

But the jury here, unlike that in *Winograd,* was also instructed: *"Do not include interest on any amount of damages you find."* (Emphasis added.)

The trial court awarded prejudgment interest starting "180 days following occurrence giving rise to cause of action [2,739 days]." In counting back 2,739 days plus 180 days, it is clear that the trial court used the Maloney Pipeline purchase date of August 23, 1985, as the date of the occurrence. That means prejudgment interest under the judgment began accruing six months after the date of the incident giving rise to the cause of action. This precise method of calculation was approved by the Texas Supreme Court in *Cavnar,* 696 S.W.2d at 555, 556, and extended to non-personal injury cases in *Perry Roofing Co. v. Olcott,* 744 S.W.2d 929, 931 (Tex.1988); *see also Morgan v. Ebby Halliday Real Estate,* 873 S.W.2d 385, 387–89 (Tex.App.—Fort Worth 1993, no writ); *Spangler v. Jones,* 861 S.W.2d 392, 397–98 (Tex.App.—Dallas 1993, writ denied) (listing different types of cases, including DTPA cases, in which *Cavnar* equitable prejudgment interest has been awarded).

Arthur Andersen next argues that the trial court *abused its discretion* in awarding equitable prejudgment interest, compounded daily, citing *Spangler v. Jones,* where the Dallas Court of Appeals stated:

Spangler's claims fall within the category of claims for which equitable prejudgment interest *may* be awarded. The decision of whether this case merits an award of prejudgment interest is left to the discretion of the trial court. The trial court is to make this decision using the equitable principles and public policy reasons set forth in *Cavnar.*

*Spangler,* 861 S.W.2d at 398–99 (citations omitted) (emphasis in original). The court of appeals remanded *Spangler* to the trial court so that it could determine whether prejudgment interest should be awarded.

Arthur Andersen argues that the trial court abused its discretion in awarding prejudgment interest to PECO because (1) the damage questions were improperly submitted to the jury over Arthur Andersen's informal and formal objections, and (2) the improperly submitted damage questions denied Arthur Andersen the jury trial to which it was constitutionally entitled concerning the amount of PECO's asserted damage. We have already ruled the damage questions were proper.

Arthur Andersen further argues that the judgment should, at a minimum, be reformed to provide for simple interest, rather than daily compounded interest. In the trial court's discretion, equitable prejudgment interest may be compounded daily in accordance with *Cavnar. Spangler,* 861 S.W.2d at 398–99; *Morgan,* 873 S.W.2d at 387–88.

The supreme court stated in *Perry Roofing,* 744 S.W.2d at 930, and again in *Rio Grande Land & Cattle Co.,* 758 S.W.2d 747, 748 (Tex.1988) that the award of equitable prejudgment interest has as its goal the twin aims of discouraging delay and encouraging compromise. *Spangler* directed the trial court to make a decision concerning prejudgment interest using the equitable principles and public policy reasons set forth in *Cavnar.* 861 S.W.2d at 398–99. According to *Cavnar,* the primary objective of awarding prejudgment interest in civil actions is to compensate the injured plaintiff, not punish the defendant. 696 S.W.2d at 552.

Having reviewed the entire statement of facts and transcript, we cannot say that the trial court abused its discretion in awarding equitable prejudgment interest compounded daily under *Cavnar.*

Alternatively, Arthur Andersen contends the rate of prejudgment interest should be six percent per annum under Tex.Rev.Civ. Stat.Ann. art. 5069–1.03 (Vernon 1987), for a portion of the damages, the purchase price for Maloney Pipeline, because this amount was liquidated or ascertainable. Article 5069–1.03 states:

When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

There are two requirements before article 5069–1.03 may be applied: first, there must be a suit on an account or contract; second, the contract must fix the measure by which the sum payable can be ascertained with reasonable certainty. *Perry Roofing,* 744 S.W.2d at 930–31. In the present case, PECO did not assert either a suit on an account or a breach of contract cause of action. Accordingly, six percent is not the appropriate prejudgment interest rate in this case. *See Allied Chemical Co. v. DeHaven,* 824 S.W.2d 257, 266–67 (Tex.App.—Houston [14th Dist.] 1992, no writ) (discussing development of the law in this area, and noting significance of evidence regarding damages for breach of contract); *see also Shell Pipeline Corp. v. Coastal States Trading, Inc.,* 788 S.W.2d 837, 848 (Tex.App.—Houston [1st Dist.] 1990, writ denied).

We overrule Arthur Andersen's point of error two.

PECO asserts in its point of error two that the trial court erred in its award of prejudgment interest because the trial court deducted the $2,000,000 settlement amount from the damage finding *before* allowing the accrual of prejudgment interest. PECO argues that the settlement credit should have been applied only *after* prejudgment interest had been calculated on the full amount of actual damages found by the jury.

PECO's actual damages as found by the jury included $4,088,237, which reflected the purchase price of the Maloney Pipeline stock. The record reflects that PECO did not pay that entire $4,088,237; part of that amount, as earlier noted, consisted of promises to pay money in the future. Those promises to pay money in the future, to the extent of $2,000,000, were cancelled by the

seller Ramteck II, pursuant to a settlement agreement entered into before suit was filed. Thus, PECO never parted with any portion of the $2,000,000. PECO did not satisfy the prerequisite for obtaining equitable prejudgment interest on that $2,000,000: that its "damages have actually been sustained." *Cavnar*, 696 S.W.2d at 554. *See also Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 8–10, 12 (Tex.1992); *Berry Property Management v. Bliskey*, 850 S.W.2d 644, 671 (Tex.App.—Corpus Christi 1993, writ dism'd); *Roberts v. Grande*, 868 S.W.2d 956, 960 (Tex.App.—Houston [14th Dist.] 1994, no writ). Accordingly, we hold the trial court did not err in deducting the $2,000,000 settlement amount from PECO's damages *before* calculating prejudgment interest.

We overrule PECO's point of error two.

In its third point of error, Arthur Andersen asserts that PECO failed in its proof to segregate the attorney's fees among the proper parties and claims, and that therefore the judgment awarding $1,973,009 in attorney's fees is improper.

From the beginning, there has been only one party defendant in this lawsuit, Arthur Andersen. PECO's expert witness testified that the total number of hours billed in this lawsuit by PECO's four attorneys and paralegals was reasonable, and that the total attorney and paralegal fees of $827,255 was fair and reasonable for the services performed in this case. The factors the expert considered were the complexity of the lawsuit, the novelty of the issues, the experience and reputation of the attorneys, whether the attorneys had to forego taking on other cases, and whether similar fees were charged by other lawyers. The expert also testified that, in accordance with the agreement between PECO and its attorneys, only one-half of the fees had been billed to PECO. The remainder was covered by a 20 percent contingent fee. The expert opined that such a contingent fee was reasonable. The expert also opined that if a case was settled after proceeding to trial, a lawyer ordinarily charged 40 or 45 percent of the gross amount

recovered, and that such a contingent fee would be reasonable in this case.

The jury answered question 20 as follows:

What is a *reasonable* fee for the *necessary* services of PECO's attorneys in this case, stated:

| | | |
|---|---|---|
| a. | in dollars and cents | $1,485,000 |
| b. | as a percentage of PECO's recovery, if any | 27% |
| c. | in dollars and cents, together with a percentage of PECO's recovery, if any | $400,000 + 20% |

Please answer a., b., and c. without considering which sum will actually be awarded by the court.

(Emphasis added).

PECO elected the straight percentage method of calculation, and the trial court awarded $1,973,009 as attorney's fees, computed as 27 percent of PECO's total recovery of $7,307,440 [actual damages ($5,449,468) minus the settlement amount ($2,000,000), plus $1,000 DTPA additional damages and prejudgment interest ($3,856,972)].

Section 17.50(d) of the Texas Revised Civil Statutes (Vernon 1987) provides that a prevailing consumer shall be awarded reasonable and necessary attorney's fees. The party seeking to recover attorney's fees carries the burden of proof. *Sterling*, 822 S.W.2d at 10. In order to show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred, while suing the defendant sought to be charged with the fees, on a claim which allows recovery of such fees. *Id.* Generally, when a suit involves more than one cause of action in which attorney's fees are recoverable, the party seeking to recover such fees must present specific evidence indicating the amount of time incurred on that cause of action, unless the causes of action are so intertwined that they are inseparable, in which case, the fees may be recovered without segregation of the attorney time to each cause of action. *Briercroft Service Corp. v. Perez*, 820 S.W.2d 813, 817 (Tex. App.—Corpus Christi 1990), *aff'd*, 809 S.W.2d 216 (Tex.1991).

In *Perez*, the court concluded that the plaintiff's causes of action for breach of warranty, breach of contract, misrepresentation, and deceptive trade practices were inseparable because they required proof of the same facts. *Id.* at 817. Similarly, our review of the record reveals that PECO's causes of action against Arthur Andersen required proof of the same facts, and were therefore inseparable.

Accordingly, we overrule Arthur Andersen's point of error three.

In its fifth point of error, Arthur Andersen asserts the trial court erred in awarding an attorney fee amount based on a "percentage of recovery." Arthur Andersen argues that a contingent fee based upon a percentage of recovery is an improper measure of attorney's fees to be awarded under the DTPA. This Court, and other appellate courts, have specifically rejected this argument. *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 916–17 (Tex.App.—Houston [1st Dist.] 1993, *writ granted*), 37 Tex.Sup.Ct.J. 667 (April 20, 1994); *Morgan*, 873 S.W.2d at 389–90; *State Farm Fire & Cas. Co. v. Price*, 845 S.W.2d 427, 436 (Tex.App.—Amarillo 1992, writ dism'd by agr.); *March v. Thiery*, 729 S.W.2d 889, 897 (Tex.App.—Corpus Christi 1987, no writ); *see also Liberty Mut. Ins. Co. v. Allen*, 669 S.W.2d 750, 755 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.); *Texas Gen. Indem. Co. v. Speakman*, 736 S.W.2d 874, 885–86 (Tex.App.—Dallas 1987, no writ).

We overrule Arthur Andersen's fifth point of error.

In its first point of error, PECO asserts the trial court erred in calculating the amount of PECO's attorney's fees. The trial court computed attorney's fees to be 27% of PECO's damages (actual damages plus prejudgment interest). PECO argues it was entitled to attorney's fees computed as 27% of PECO's *recovery* (actual damages plus prejudgment interest *plus attorney's fees* ).

In *Roberts*, our sister court, faced with the same issue, rejected the argument PECO makes here. 868 S.W.2d at 961. We agree with the analysis and conclusion in *Roberts*.

We overrule PECO's first point of error.

We affirm the judgment.